## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MUTUAL PHARMACEUTICAL
COMPANY, INC., et al.,

        Plaintiffs,

-v-

WATSON PHARMACEUTICALS,
INC., et al.,

        Defendants.

Civil Action No. 3:09-cv-5421 (GEB)
(TJB)

**Filed Electronically**

---

## DEFENDANT WEST-WARD PHARMACEUTICAL CORP.'S RESPONSE IN OPPOSITION TO MUTUAL'S RULE 56(f) REQUEST FOR ADDITIONAL DISCOVERY

Michael Dore
Jennifer M. Storipan
LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500

Clark G. Sullivan (*Pro Hac Vice*)
Karen B. Bragman (*Pro Hac Vice*)
Jared M. Lina (*Pro Hac Vice*)
ARNALL GOLDEN GREGORY LLP
171 17th Street, NW
Suite 2100
Atlanta, GA 30363
(404) 873-8500

*Attorneys for Defendant West-Ward Pharmaceutical Corp.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................ 1

DISCUSSION AND CITATION TO AUTHORITIES ..................................... 2

    I.    MUTUAL'S RULE 56(f) REQUEST SHOULD BE
    DENIED BECAUSE RESOLUTION OF THE MOTION
    HINGES ON MUTUAL'S OWN CONDUCT AND
    MUTUAL FAILS TO DEMONSTRATE THAT THE
    DISCOVERY IT SEEKS WOULD PREVENT THE
    ENTRY OF SUMMARY JUDGMENT AGAINST IT .................. 2

    II.    THE ISSUES ON WHICH MUTUAL CLAIMS IT NEEDS
    DISCOVERY ARE EITHER REDUNDANT OF WHAT IT
    ALREADY HAS DISCOVERED OR IRRELEVANT TO
    RESOLUTION OF THE MOTION ................................................. 4

CONCLUSION ................................................................................................. 9

# TABLE OF AUTHORITIES

## Federal Cases

*Hancock Indus. v. Schaeffer*, 811 F.2d 225, 230 (3d Cir. 1986) .............................. 3

*Horvath v. Keystone Health Plan East Inc.*, 333 F.2d 450 (3d Cir. 2002).............. 4

*In Re Compensation of Managerial, Professional and Technical Employees Antitrust Litigation*, 2008 WL 3887619 (D.N.J. August 20, 2008) ............... 4

*Rosenberg v. JCA Assoc., Inc.*, 2007 WL 1038893, \*6 (D.N.J. Mar. 30, 2007) ....................................................................................................... 2, 8

*San Filippo v. Bongiovanni*, 30 F. 3d 424, 432 (3d Cir.1994) ................................ 9

*Schneider v. Township of Toms River*, 2010 WL 1379712 (D.N.J. March 29, 2010) ...................................................................................................... 3

## Federal Rules

FED. R. CIV. P. 56(f) ................................................................................................ 2

2867766v2

## PRELIMINARY STATEMENT

Presently before the Court is Defendant West-Ward Pharmaceutical Corp.'s ("West-Ward") Motion for Summary Judgment based on Mutual's unclean hands (the "Motion").[1]  While Mutual substantively opposed the Motion, it also seeks to delay its resolution by arguing that the Court should allow Mutual to take unspecified additional discovery prior to adjudication of the Motion.[2]  However, the most Mutual can say in support of its request is that there are "numerous facts upon which discovery *could be* conducted to refute the unclean hands theory espoused by West-Ward."  Mutual's Resp. Br. at 4 (emphasis added).  Tellingly, while Mutual points to discovery that it *could* take, it does not identify any material facts it reasonably hopes to uncover or how any further discovery possibly could overcome the admissions it already has made.  For the reasons set forth below, Mutual's request for delay, based on its speculation that there may be some

---

[1]     The three Plaintiffs, Mutual Pharmaceutical Company, Inc., AR Holding Company, Inc. and AR Scientific, Inc., are referred to collectively as "Mutual" in this response.

[2]     Notably, neither Mr. Magrab's Affidavit ("Magrab Aff.") nor Mutual's Response identifies what specific discovery Mutual needs to take in its quest to locate evidence that might counter West-Ward's Motion.  Instead, it only identifies broad topics.  As noted below, what Mutual seeks is not relevant to resolution of the Motion and would not create any material issue of fact on the discrete issue before the Court.

contrary evidence that an avalanche of costly discovery might disclose, should be denied.

## DISCUSSION AND CITATION TO AUTHORITIES

I.     **MUTUAL'S RULE 56(f) REQUEST SHOULD BE DENIED BECAUSE RESOLUTION OF THE MOTION HINGES ON MUTUAL'S OWN CONDUCT AND MUTUAL FAILS TO DEMONSTRATE THAT THE DISCOVERY IT SEEKS WOULD PREVENT THE ENTRY OF SUMMARY JUDGMENT AGAINST IT.**

West-Ward's Motion is premised on the undisputed fact that, for thirteen years, Mutual sold unapproved colchicine tablets in a manner *identical* to West-Ward. While Mutual apparently hopes that further discovery will turn up a "smoking gun," the simple fact of the matter is that Mutual's own conduct is the basis of West-Ward's Motion and, if evidence exists for denying the Motion, Mutual was in the best position to produce that evidence or, at least, to identify the reasons it has been unable to locate that evidence.

Federal Rule 56(f) allows a party to oppose a summary judgment motion by submitting an affidavit that sets forth good reasons why the party needs additional discovery in order to oppose the motion. *See* FED. R. CIV. P. 56(f). *See also Rosenberg v. JCA Assoc., Inc.*, 2007 WL 1038893, *6 (D.N.J. Mar. 30, 2007). [3]

---

[3]     Copies of the unreported cases cited in this brief are attached as Group Exhibit "A."

However, no amount of additional discovery can alter the already admitted facts proving that Mutual marketed its unapproved colchicine in the exact same manner West-Ward does. *See* Ex. B attached hereto[4] and West-Ward's Reply Br. in Supp. of its Mot. For Summ. J.

In support for its request for additional discovery, Mutual offers the Magrab Aff. from its General Counsel, which cites a number of topics on which discovery could be taken. However, the Magrab Aff. fails to identify what material facts Mutual hopes to procure that might preclude summary judgment in this case. *See Hancock Indus. v. Schaeffer*, 811 F.2d 225, 230 (3d Cir. 1986) (a Rule 56(f) movant must advise the court "what material facts [it] hoped to uncover to support its allegations").

In addition to failing to identify the material facts it reasonably hopes to uncover that would avoid the entry of judgment against it, Mutual also fails to make the required ancillary showing that the discovery it seeks would prevent the entry of summary judgment against it. *See, e.g., Schneider v. Township of Toms River*, 2010 WL 1379712 (D.N.J. March 29, 2010) (Honorable Garrett Brown, Jr.) (noting that the Third Circuit has interpreted Rule 56(f) as requiring the party

---

4    Exhibit B is a List of Key Admitted Facts prepared by West-Ward by comparing its Statement of Undisputed Material Facts (the "SOF") to the Plaintiffs' Response to that document.

3

seeking additional discovery to demonstrate how the requested information would preclude summary judgment); *In Re Compensation of Managerial, Profess'l & Tech. Employees Antitrust Litig.*, 2008 WL 3887619 (D.N.J. August 20, 2008) (Honorable Garrett Brown, Jr.)(denying Rule 56(f) request where the requested discovery would be an eleventh hour "fishing expedition" and would not prevent the grant of summary judgment); *Horvath v. Keystone Health Plan East Inc.*, 333 F.3d 450 (3d Cir. 2002) (affirming refusal to grant additional discovery in part because respondent failed to demonstrate that any of the discovery sought would have yielded evidence that precluded summary judgment). Having failed to demonstrate how any of what it seeks would (or even might) preclude the entry of summary judgment, Mutual's request for additional discovery must be denied.

## II.    THE ISSUES ON WHICH MUTUAL CLAIMS IT NEEDS DISCOVERY ARE EITHER REDUNDANT OF WHAT IT ALREADY HAS DISCOVERED OR IRRELEVANT TO RESOLUTION OF THE MOTION.

Mutual's request for further discovery is particularly disingenuous when the Court considers the history of the case and the discovery that already has been taken.   After filing the Complaint more than one year ago, Mutual sought an immediate preliminary injunction to force the Defendants to stop selling unapproved colchicine.   At that time, Mutual obviously was aware that it had engaged in the same conduct for over a decade.

4

In denying the requested preliminary injunction, the court observed that "the evidence indicates that almost up to the moment they commenced this action, [the Plaintiffs] were engaged in precisely the same activity over which they now seek to enjoin their competitors."  Court Order dated October 19, 2009 [Docket Entry No. 139].  While the California court did not directly rule on West-Ward's unclean hands defense at the preliminary injunction stage, the Court remarked nonetheless that "the doctrine of unclean hands substantially decreases the likelihood that Mutual will ultimately prevail on the merits."  *Id.*

In no uncertain terms, this was a warning that Mutual's claims were subject to dismissal based on its unclean hands.  At a minimum, Mutual was on notice that it needed to address these issues in discovery, and it is beyond question that the written discovery it already has served was designed to elicit information on this issue.[5]  Mutual issued subpoenas to the Price Lists and Wholesalers who allegedly carried out West-Ward's "false advertising" in December 2009.  Mutual has not

---

[5]      Because the discovery served on West-Ward and certain third-parties is not part of the record, West-Ward has attached copies of the written discovery that Mutual served on West-Ward as Group Exhibit C, along with an exemplary subpoena that Mutual served on the Price Lists and Wholesalers (who are identified in the Complaint) as Exhibit D.  Even a cursory examination shows that Mutual sought discovery on the issues bearing on the unclean hands defense.  *See, e.g.,* Ex. C at ¶¶ 7-10, 12-13, 16-17, 18 and 37 and Ex. D at ¶¶ 1-2, 6 and 9-12.

5

identified any deficiency in these third-party productions, or what further discovery from them might uncover.

The parties also engaged in months and multiple rounds of written discovery. Several months ago, Mutual received from West-Ward responses to interrogatories, requests to admit and requests to produce, as well as the production of over 35,000 pages of documents, detailing the "advertising" practices of which West-Ward is accused in Mutual's complaint. All that remains is for West-Ward to supplement its previous production with similar documents relating to its colchicine sales after December 2009. Once again, Mutual fails to identify any deficiency in this discovery, or what it hopes to gain from further discovery.

Given the extent of discovery that has transpired, Mutual was clearly in a position to at least inform the Court what evidence it might find in discovery which, if found, would create a genuine issue of fact for trial. It did not but, instead, asks the Court to allow it to take further discovery on certain identified issues that would be duplicative of the discovery Mutual already has taken. *See* Magrab Aff. at ¶5 (d), (e), (f), (i), (j), (k), (l). By way of example, Mutual claims that it needs discovery as to: "(i) Whether the Price Lists and Wholesaler Ordering Systems list West-Ward's unapproved colchicine as being approved by the FDA." Magrab Aff. at 3 ¶5(i). Without a doubt, if Mutual had found any such evidence in

6

the thousands of documents that West-Ward, the Price Lists and the Wholesalers have produced to date, it would have been tendered in opposition to the Motion in an effort to prove that West-Ward markets its colchicine differently than Mutual did. Given the exhaustive search that already has been made, it is a fair conclusion that no additional discovery on this issue would be fruitful and it should not be permitted.

In addition to requesting duplicative discovery, Mutual relies on its feigned lack of knowledge regarding extraneous facts that have no bearing on the core facts relevant to West-Ward's Motion. For example, Mutual professes to need additional discovery on topics such as: (i) West-Ward's colchicine market share; (ii) "[t]he circumstances surrounding the FDA's inspection of the plant where West-Ward manufactures colchicine;" (iii) how Therapeutic Equivalency Ratings of unapproved colchicine products are determined; and (iv) "[t]he meaning of the "N/A" or "N/R" Therapeutic Equivalency Ratings, and whether those ratings denote FDA-approval;"[6] (v) steps taken by West-Ward to ensure that its tablets are

_____

[6]    Again, by way of example only, Mutual seeks additional discovery on: "[t]he meaning of "N/A" or "N/R" Therapeutic Equivalency Ratings, and whether those ratings denote FDA-approval." Considering that Mutual is an experienced drug manufacturer that admittedly used the very same terminology to market its unapproved colchicine, (see, SOF ¶19-20 and 23 and responses thereto), the assertion that it needs discovery on this issue is obviously only for delay.

not confused with Mutual's tablets; and (vi) the safety and prescribing information West-Ward provides to the Price Lists and Wholesaler Ordering Systems. *See* Magrab Aff. at ¶5 (a), (b), (c), (g), (h), (m) and (n). It is obvious that these issues have no bearing on West-Ward's Motion.

Admittedly, West-Ward's Statement of Undisputed Material Facts was over-inclusive, and included myriad facts that only provided background for this dispute. West-Ward chose to include additional information in the SOF because the Motion was the Court's first introduction to a unique set of facts underlying an atypical and dubious false advertising lawsuit. Stripped to its core, however, West-Ward's Motion hinges on Mutual's own admitted conduct: its previous sales of unapproved colchicine. Not surprisingly, because Mutual does not dispute any of those facts, the Magrab Aff. identifies no areas where additional discovery is needed with respect to these sales. Instead, Mutual seized upon the extraneous background facts identified in West-Ward's overbroad Statement to claim that these are somehow essential to the present Motion.

Additional discovery on these topics is simply not necessary in order for the Court to rule on whether Mutual's hands are unclean. Stated differently, any such evidence would not create a material issue of fact regarding Mutual's own admitted conduct. *See Rosenberg v. JCA Assoc., Inc.*, 2007 WL 1038893, *6

8

(D.N.J. Mar. 30, 2007) (denying a Rule 56(f) request for continuance because "the Plaintiffs have failed to persuade the Court that any of the information sought, 'if uncovered ... would preclude summary judgment....'") (quoting *San Filippo v. Bongiovanni*, 30 F. 3d 424, 432 (3d Cir. 1994)).  In summary, it is clear that Mutual has not, and cannot, make the targeted showing that a party must make in order to prevail on a request to delay resolution of a summary judgment motion.

## CONCLUSION

West-Ward has isolated a legal issue for resolution by the Court and the Court is able to adjudicate this issue by applying controlling law to undisputed facts.  Granting additional discovery would only delay the resolution of this case and add to the parties' already tremendous expense and burden.  In this context, such an effort should not be permitted by the Court

Based on the foregoing, Mutual's Rule 56(f) request should be denied.

Respectfully submitted this 30th day of August 2010.

LOWENSTEIN SANDLER PC

/s/ Michael Dore
Michael Dore
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone:  (973) 597-2344
Facsimile:  (973) 597-2345
mdore@lowenstein.com

9

Clark G. Sullivan (*pro hac vice*)
Karen B. Bragman (*pro hac vice*)
Jared M. Lina (*pro hac vice*)
ARNALL GOLDEN GREGORY LLP
171 17th Street NW, Suite 2100
Atlanta, Georgia 30363
Telephone:  (404) 873-8500
Facsimile:  (404) 873-8501
Email:  clark.sullivan@agg.com
Email:  karen.bragman@agg.com
Email:  jared.lina@agg.com

*Attorneys for Defendant West-Ward
Pharmaceutical Corp.*

10

2867766v1

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 3887619 (D.N.J.), 2008-2 Trade Cases P 76,438
**(Cite as: 2008 WL 3887619 (D.N.J.))**

**H**
Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
In re COMPENSATION OF MANAGERIAL,
PROFESSIONAL AND TECHNICAL EMPLOY-
EES ANTITRUST LITIGATION.
MDL Docket No. 1471.
Master Docket No. 02-CV-2924 (GEB).

Aug. 20, 2008.

**MEMORANDUM OPINION**

BROWN, District Judge.

*1 This matter comes before the Court upon De-
fendants' motion for summary judgment (Docket
No. 151). The Court has jurisdiction over this mat-
ter pursuant to 28 U.S.C. § 1331. The Court con-
sidered the parties' submissions and heard oral ar-
gument on July 24, 2008. For the reasons set forth
below, the Court will grant Defendants' motion for
summary judgment.

**I. RELEVANT BACKGROUND**

Plaintiffs, several managerial, professional and
technical ("MPT") employees of certain major U.S.
oil companies ("Plaintiffs"), allege that defendant
oil companies ("Defendants"), in violation of Sec-
tion 1 of the Sherman Act, exchanged detailed
salary information so as "to suppress the growth in
oil industry salary levels" and eliminate a so-called
"oil industry premium" paid on the salaries of MPT
employees.

This case originates from four separate suits that
were consolidated before this Court in June 2002
by the Judicial Panel on Multidistrict Litigation.
*Todd v. Exxon,* the first of the four consolidated

cases to be filed, was commenced in 1997 in the
Southern District of New York. Two cases were
subsequently filed in this district and one case was
filed in the Northern District of Texas.

Prior to its consolidation before this Court, the
*Todd v. Exxon* matter was dismissed by the South-
ern District of New York for failure to state a claim
because "the relevant market proposed by Plaintiff
does not rise to the level of plausibility required in
an antitrust action." *Todd v. Exxon,* 126 F.Supp.2d
321, 325 (S.D.N.Y.), *vacated by,* 275 F.3d 191 (2d
Cir.2001). The Second Circuit vacated the dis-
missal and remanded the matter to the district court,
finding "the allegation of a market limited to em-
ployers in the oil and petrochemical industry is
plausible on its face." *Todd,* 275 F.3d at 205.

After consolidation, discovery in the consolidated
action was bifurcated and initially limited to class
certification issues. Plaintiffs has moved twice for
class certification and this Court has denied both
motions. On March 27, 2003, the Court denied
Plaintiffs' first motion to certify a class under Fed-
eral Rule of Civil Procedure 23(b)(3). After medi-
ation efforts failed, Plaintiffs sought class certifica-
tion for an injunction class under Rule 23(b)(1) or
23(b)(2). On January 5, 2006, this Court denied
Plaintiffs' second motion for class certification. On
February 15, 2006, the Court denied a motion for
reconsideration of that decision.

On the motion for reconsideration, Plaintiffs argued
that the Court overlooked a key holding from the
Second Circuit's decision in *Todd,* namely that "
'[i]f a plaintiff can show that a defendant's conduct
exerted an actual adverse effect on competition, this
is a strong indicator of market power [,]' and
'arguably is more direct evidence of market power
than calculations of elusive market share figures.' "
(Op. on Mot. for Recons., Docket No. 128 at 2 (
*quoting Todd,* 275 F.3d at 206).) This Court denied
the motion for reconsideration and clarified that
"even using the direct evidence method, at a min-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3887619 (D.N.J.), 2008-2 Trade Cases P 76,438
**(Cite as: 2008 WL 3887619 (D.N.J.))**

imum, Plaintiffs must define the parameters of the market in question." *Id.* The case was subsequently stayed and referred to mediation.

**\*2** On January 7, 2008, the parties advised the Court that mediation had again proven unsuccessful. Defendants requested a briefing schedule for summary judgment on the issues of relevant market and market power. Plaintiff did not oppose the briefing schedule, but informed the Court that they might file a Rule 56(f) affidavit seeking additional discovery. On February 21, 2008, the present motion was filed. As discussed below, Defendants seek summary judgment because "plaintiffs cannot meet their burden to prove that defendants' information exchanges caused harm to competition within a relevant market." (Defs.' Br. at 36.) Plaintiffs oppose this motion and have filed a Rule 56(f) affidavit.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

In deciding a motion for summary judgment, a court should grant the motion if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996). The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See Hancock Indus. v. Schaeffer,* 811 F.2d 225, 231 (3d Cir.1987). In arguing against a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV.

P. 56(e).

Federal Rule of Civil Procedure 56(f) provides as follows:

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) deny the motion;
>
> (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
>
> (3) issue any other just order.

FED. R. CIV. P. 56(f). To succeed under Rule 56(f) , a party usually "must identify with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *Lunderstadt v. Colafella,* 885 F.2d 66, 71 (3d Cir.1989) (internal quotations and citations omitted). "However, because '[a] district court has discretion in acting on Rule 56(f) motions,' this list of factors is not exhaustive. Instead, it 'simply offer[s] a guide for the district court to follow in exercising its discretion under Rule 56(f).' " *Horvath v. Keystone Health Plan East, Inc.,* 333 F.3d 450, 458 (3d Cir.2003) (internal quotations and citations omitted). Regardless of the Court's determination, "[i]t is 'improper' for a district court to rule on summary judgment without first ruling on a pending Rule 56(f) motion." *Doe v. Abington Friends School,* 480 F.3d 252, 257 (3d Cir.2007) (citation omitted).

## III. SECTION 1 OF THE SHERMAN ACT

**\*3** Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. "To establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3887619 (D.N.J.), 2008-2 Trade Cases P 76,438
(Cite as: 2008 WL 3887619 (D.N.J.))

competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.,* 423 F.3d 184, 207 (3d Cir.2005).

To determine whether a particular action unreasonably restrains trade, courts have applied one of two different methods of analysis: (1) the per se rule; and (2) the rule of reason. Under the per se rule, certain categories of restraints are simply presumed to be unreasonable and no elaborate inquiry is necessary. *See, e.g., Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723 (1988) ("per se rules are appropriate only for 'conduct that is manifestly anticompetitive' ") (quoting *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 50 (1977)). On the other hand, the rule of reason, which is the "prevailing standard," ordinarily requires the Court to engage in a detailed analysis of the effect that the restraint has on competition in a relevant market. *See Sylvania Inc.,* 433 U.S. at 50-51, 53 n. 21 (holding that the rule of reason typically requires a detailed examination "in light of the competitive situation in 'the product market as a whole' "); *United States v. Brown Univ.,* 5 F.3d 658, 672 (3d Cir.1993) (holding that the rule of reason "ordinarily requires a detailed inquiry into the market impact of a restraint").[FN1]

> FN1. "[A] third standard that falls somewhere between the rule of reason and per se standards" is the "quick look" rule of reason. *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 461 n. 6 (D.N.J.1998). This method "applies in cases where per se condemnation is inappropriate but where no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint." *Gordon,* 423 F.3d at 209-210 (*citing Brown Univ.,* 5 F.3d at 669). Under the "quick look" method, "the competitive harm is presumed and the defendant must set forth some competitive justification for the restraints." *Id.* at

210. "[T]he quick look approach may be applied only when an observer with even a rudimentary understanding of economics could conclude that the arrangement in question would have an anticompetitive effect on customers and markets." *Id.* As the Second Circuit found in *Todd,* "[t]he alleged conduct in this case-the exchange of information-is not so inherently or intuitively anticompetitive." 275 F.3d at 207.

Here, Plaintiffs allege that Defendants engaged in data exchanges that allegedly restrained competition. According to Plaintiffs, the "central premise of this case" is an "information exchange [that] was designed to eliminate" the wage premium over "general industry wage levels" paid to MPT employees by Defendants. (Pls.' Br. at 5.) Such information exchanges are subject to analysis under the rule of reason. *United States v. United States Gypsum Co.,* 438 U.S. 422 (1978); *Todd,* 275 F.3d at 199. This is because "[t]he exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *United States Gypsum Co.,* 438 U.S. at 441 n. 16.

## IV. SUMMARY OF THE PARTIES' ARGUMENTS

Defendants argue that "Plaintiffs have not presented evidence sufficient to create a triable issue of fact with respect to their claim that defendants' information sharing caused anticompetitive effects in a relevant market." (Defs.' Br. at 1.) Defendants argue that Plaintiffs cannot prove that "the relevant product market is limited to oil and petrochemical industry employers or that they lack substitutable job opportunities outside of those employers." (*Id.*) Defendants contend that "plaintiffs' own admissions" in depositions demonstrate the falsity of their theory "that they lack outside job opportunities because they have developed industry-specific

Not Reported in F.Supp.2d, 2008 WL 3887619 (D.N.J.), 2008-2 Trade Cases P 76,438
(Cite as: 2008 WL 3887619 (D.N.J.))

expertise that eliminates other employers as substitutes." (*Id.* at 2.) Defendants further argue that this Court, in denying class certification, has already rejected any attempt by Plaintiffs to proceed without having to prove a relevant product market. (*Id.* at 6-7.) Defendants argue that Plaintiffs "cannot escape" the requirement that they prove a relevant market. (*Id.* at 7.)

\*4 Plaintiffs respond by asserting that discovery has been denied on the "core issue" in this case, namely, "whether defendants were able to suppress the growth in oil industry salary levels so as to achieve their goal of eliminating the 'oil industry premium.' " (Pls.' Br. at 1.) Plaintiffs contend that Defendants seek "to disprove the existence of relevant markets that plaintiffs have not alleged and have no bearing on the conduct challenged in this case." (*Id.*) Plaintiffs point to the Complaint filed in June 1997 in the *Todd* case, which they contend focuses on the market "for the services of experienced, salaried, non-union, managerial, professional and technical (MPT) employees in the oil and petrochemical industry, in the continental United States and the various submarkets thereof." (*Id.* at 1-2 (quoting Compl. at ¶ 97).) Plaintiffs state that the Second Circuit already ruled that this was a plausible market despite the fact that the named plaintiff in that case, Roberta Todd, had found alternative employment "outside of the industry at higher pay." (*Id.* at 2 .) Plaintiffs contend that summary judgment is inappropriate because Defendants rely "on nothing more than the same facts that the Second Circuit *rejected* as [in]sufficient to defeat plaintiffs' claims." (*Id.* at 3 (emphasis in original).) Specifically, Plaintiffs claim that Defendants rely on "nothing other than evidence that these plaintiffs could have been employed by non-defendants employers outside of the oil and petrochemical industry." (*Id.* at 2.) Plaintiffs argue that the Defendants' market power over the relevant market alleged can be demonstrated through evidence that Defendants "were able to suppress the growth in industry salary levels" for MPT employees. (*Id.* at 5.)

Plaintiffs also argue that the discovery permitted to date raises genuine issues of material fact that preclude summary judgment. (*Id.* at 5, 23-26.) Plaintiffs points out that the "data exchange in this case was extensive, detailed and highly suspicious," that Defendants "sought to align salaries with ... other oil companies, and the extensive data provided through the [Oil Industry Group] allowed them to do so." (*Id.* at 5-6.) Plaintiffs state that pay levels within the oil industry were higher than pay levels outside of the industry and that "defendants' efforts to reduce the differential between oil industry and general industry pay were meeting with some success." (*Id.* at 7-8.)

Finally, Plaintiffs contend that summary judgment should be denied because "merits discovery ... may reveal direct evidence of an agreement among these defendants," which would be per se illegal. (*Id.* at 7.) Plaintiffs also outline a number of topics on which they wish to take discovery. (*Id.* at 10, 37-40.)

Defendants reply that Plaintiffs use the "flawed approach" of referencing the *"average* compensation paid to tens of thousands of employees occupying thousands of different jobs," despite the fact that the "cases now involve antitrust claims of ten individuals who had specific jobs." (Defs.' Reply Br. at 1 (emphasis in original).) Defendants condemn as "false logic" Plaintiffs' argument that evidence of a reduction in an average "oil industry premium" somehow proves an anticompetitive effect in the markets relevant to the individual plaintiffs. Defendants assert that the Court "has already rejected this proposed junk economics." (*Id.* at 4.)

**V. THE COURT'S ANALYSIS**

**A. Proving Market Power: The Traditional Method and the Direct Evidence Method**

\*5 The *Todd* court stated that an important factor in analyzing a data exchange under the rule of reason is "the market power of the defendants." 275 F.3d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3887619 (D.N.J.), 2008-2 Trade Cases P 76,438
**(Cite as: 2008 WL 3887619 (D.N.J.))**

at 199. According to the *Todd* court, "[o]ne tradi-tional way to demonstrate market power is by de-fining the relevant product market and showing de-fendants' percentage share of that market." *Id.* However, "[m]arket power defined as a percentage market share ... is not the only way to demonstrate defendants' abilities to depress salaries." *Id.* at 206. The *Todd* court stated that "[i]f a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power." *Id.* Moreover, "this arguably is more direct evidence of market power than calcula-tions of elusive market share figures." *Id.* (*citing Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 98 (2d Cir.1998) (stating that market power 'may be proven *directly* by evidence of the control of prices ... or it may be *inferred* from one firm's large percentage share of the relevant market")).

·1. **Traditional Method**

Under the traditional method of demonstrating mar-ket power, "[p]laintiffs have the burden of defining the relevant market." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d at 436 (*citing Pastore v. Bell Telephone Co. of Pennsylvania,* 24 F.3d 508, 512 (3d Cir.1994); *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 726 (3d Cir.1991) ). Plaintiffs then seek to demonstrate market power through the Defendants' share of the relevant mar-ket. *Todd,* 275 F.3d at 199.

In the antitrust context, "relevant market" means the "one relevant to the particular legal issue at hand." 2B Phillip E. Areeda & Herbert Hoven-kamp, *Antitrust Law: An Analysis of Antitrust Prin-ciples and Their Application* (3d ed.2007) ¶ 533. " 'The outer boundaries of a product market are de-termined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.' " *Queen City Pizza,* 124 F.3D at 436 (*citing Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962); *Tunis Bros.,* 952 F.2d at 722). As the Third Circuit noted, " '[c]ross-elasticity of demand is a measure of the

substitutability of products from the point of view of buyers. More technically, it measures the re-sponsiveness of the demand for one product to changes in the price of a different product.' " *Queen City Pizza,* 124 F.3d at 438 n .6 (*quoting* E. Thomas Sullivan and Jeffrey L. Harrison, *Under-standing Antitrust and its Economic Implications* 217 (1994)). "Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." *Todd,* 275 F.3d 191, 201-202 (citation omitted). Thus in a normal case, "the inquiry is whether a 'hypothetical cartel' would be 'substantially constrain[ed]' from increasing prices by the ability of customers to switch to other produ-cers." *Id.*

*6 As the *Todd* court stated, "[t]he fact that this case involves a buyer-side conspiracy affects how the market is defined," because the relevant market factors "are reversed in the context of a buyer-side conspiracy." 275 F.3d at 201-02. "This market is comprised of buyers who are seen by sellers as be-ing reasonably good substitutes." *Id.* at 202 (citation omitted). Thus, "[t]he proper focus is ... the commonality and interchangeability of the buy-ers, not the commonality or interchangeability of the sellers." *Id.* "At issue is the interchangeability, from the perspective of an MPT employee, of a job opportunity in the oil industry with, for example, one in the pharmaceutical industry." *Id.* "A greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question." *Id.*

"[I]n most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza,* 124 F.3d at 436 (citations omitted). In-deed, summary judgment is often inappropriate be-cause the pertinent economic facts are disputed. However, summary judgment is appropriate where the relevant economic facts are not disputed. *See, e.g., Pocono Invitational Sports Camp v. NCAA,* 317 F.Supp.2d 569, 587-87 (E.D.Pa.2004) (granting

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3887619 (D.N.J.), 2008-2 Trade Cases P 76,438
(Cite as: 2008 WL 3887619 (D.N.J.))

summary judgment to defendant where plaintiff did not provide evidence demonstrating that relevant market was limited to summer basketball camps and did not include other athletic camps).

In this case, the Second Circuit in *Todd* recognized that "Plaintiff[s] claim[ ] that MPT employees accumulate industry-specific knowledge that renders them more valuable to employers in the oil and petrochemical industry than to employers in other industries." *Todd*, 275 F.3d at 203. In so doing, "plaintiff[s are] simply alleging that a slight decrease in salary by a hypothetical oligopsonist cartel in the oil/petrochemical industry would not cause MPT employees to leave the industry because they would have difficulty finding compensation fully reflecting the value of their experience elsewhere." *Id.* at 204. The *Todd* court stated that Plaintiffs would have to prove their theory "with economic evidence regarding the cross-industrial elasticity of MPT employees":

Evidence could include information regarding, for example, the extent to which decreases in oil/petrochemical industry salaries, or increases that do not keep pace with increases in other industries, cause MPT employees to leave the industry; whether MPT employees who leave or are displaced from the oil/petrochemical industry suffer pay cuts upon switching industries; and whether it takes longer for MPT employees who leave or are displaced from oil/petrochemical industry jobs to find employment in other industries than within the same industry.

*Id.* at 204.[FN2]

FN2. In this context, the *Todd* Court stated that the fact that the plaintiff, Robert Todd, "left Exxon for a higher paying job outside of the industry ... is but one small piece of the broader cross elasticity analysis." *Id.* at 204 & n. 7.

Although the Todd court found that "the allegation of a market limited to employers in the oil and pet-

rochemical industry [was] plausible on its face," the court stated that it was not "indicat[ing] whether plaintiff will succeed in proving the alleged market," because "[i]t remains to be seen whether *every* category of MPT employee in the plaintiff class can demonstrate the requisite degree of [cross-industrial] inelasticity." *Id.* at 204-205 (emphasis in original). Thus, the *Todd* court realized that some MPT employees might be able to find reasonably substitutable job opportunities outside the oil and petrochemical industry. Accordingly the relevant labor market for those employees may not be confined to the oil and petrochemical industry. Indeed, the Court noted that:

*7 While interchangeability of the different types of employees is not an element of market definition in an oligopsony, the different types of employees will differ in how they must prove the interchangeability among employers. For example, as the district court and defendants point out, oil industry employers may not be interchangeable with pharmaceutical industry employers from the standpoint of a petroleum geologist, but the two may be more interchangeable from the standpoint of a labor lawyer. More importantly, the means of proof may be quite different; at trial the geologists must present evidence of the relative job prospects for geologists outside the oil industry, while the lawyers must explore the legal job market.

*Id.* at 202 n. 5.[FN3] Similarly, the *Todd* Court noted that "pilots-a category of MPT employee-may have a dubious claim of cross-industrial inelasticity." *Id.* at 250 n. 8.

FN3. The Second Circuit noted that because of these differences, the large proposed class might have difficulty with class certification. This proved to be the case.

Here, class certification has been denied twice. At issue is the market relevant to the individual plaintiffs that remain. Thus, under the traditional

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3887619 (D.N.J.), 2008-2 Trade Cases P 76,438
**(Cite as: 2008 WL 3887619 (D.N.J.))**

method, each of the remaining Plaintiffs must "demonstrate the requisite degree of [cross-industrial] inelasticity" regarding their job opportunities.

**2. Direct Evidence**

At this stage of the litigation, Plaintiffs have declined to pursue the traditional method of demonstrating market power in favor of attempting to show market power by "direct evidence." (Pls.' Br. at 14-23.) The *Todd* instructed the district court to "consider whether plaintiff has demonstrated anticompetitive effects as part of the court's assessment of defendants' market power." *Todd,* 275 F.3d at 207. But the *Todd* Court did not outline what evidence would constitute direct evidence of an anticompetitive effect in this case. *Id.*

As the Seventh Circuit has recognized, "[e]conomic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market." *Republic Tobacco v. N. Atl. Trading Co. Inc.,* 381 F.3d 717, 737 (7th Cir.2004). Thus, according to the Seventh Circuit, the direct evidence method does not "allow an antitrust plaintiff to dispense entirely with market definition." *Id.* Instead the cases that outline this method "stand for the proposition that if a plaintiff can show the rough contours of a relevant market, and show that the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish the defendants' market power-in lieu of the usual showing of a precisely defined relevant market and ... market share." *Id.* This Court agrees with the reasoning of the *Republic Tobacco* court. Moreover, in this Court's opinion on Plaintiffs' motion for reconsideration of the Court's denial of the second motion for class certification, the Court stated that:

> Plaintiffs would indeed have to prove the relevant product market, even if they use the direct evidence method to prove their claims. Under that approach, Plaintiffs can avoid 'calculations of elu-

sive market share figures.' But even using the direct evidence method, at a minimum, Plaintiffs must define the parameters of the market in question. Indeed, the *Todd* opinion and the cases to which it cites in support of the direct evidence method all presume the existence of some definable market.

*\*8* (Op. on Mot. for Recons., Docket No. 128 at 3 (citation omitted).) In the same opinion, the Court also addressed the declaration of Plaintiffs' expert, Professor Card, which outlined Plaintiffs' proposed method of proof. The Court stated that "[b]ut even under the direct evidence method of proof described by Professor Card, Plaintiffs would have to provide evidence of actual adverse effects within a *specific market."* (*Id.* at 4).

Plaintiffs argue, as they did on the motion for reconsideration, that they do not need to define a relevant market. The Court sees no reason to change its position. In addressing the motion for reconsideration, the Court distinguished the cases Plaintiff cited at that time by stating that "the *Todd* opinion and the cases to which it cites in support of the direct evidence method all presume the existence of some definable market." (*Id.* at 3.) Plaintiffs fail to address this distinction in their briefing. Moreover, Plaintiffs rely on only one opinion that is more recent that this Court's ruling on the motion for reconsideration: *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297 (3d Cir.2007). In *Broadcom,* the Third Circuit reversed the district court's dismissal under Rule 12(b)(6) of the plaintiffs Sherman Act § 2 claims. [FN4] While discussing the state of the law regarding monopoly power under Section 2, the Third Circuit stated in a footnote that "direct proof of monopoly power does not require a definition of the relevant market." *Id.* at 307 n. 3. The Third Circuit did not state that the direct evidence could be completely untethered or unmoored from a roughly identified relevant market. Therefore, this Court does not view the footnote from *Broadcom* as controlling here. In short, the Court concludes that the direct evidence must be "moored" to an appropriate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3887619 (D.N.J.), 2008-2 Trade Cases P 76,438
(Cite as: 2008 WL 3887619 (D.N.J.))

relevant market. Although Plaintiffs may not need to define the relevant market with the same level of precision that is required under the traditional method of demonstrating market power, Plaintiffs are required to prove, at least roughly, the parameters of the relevant labor markets.[FN5]

> FN4. Direct proof was not a contested issue in *Broadcom*. Indeed, the court identified "the relevant market as the market for Qualcomm's proprietary WCDMA technology" and ruled that the "Complaint adequately alleged ... monopoly power in the relevant market." 501 F.3d at 315.

> FN5. None of the cases cited by Plaintiff stand for the proposition that "direct evidence" can be completely untethered or unmoored from a roughly identified relevant market. Indeed, the only other Third Circuit case cited by Plaintiff on this point presumes the existence of some roughly definable relevant product market. *See Brown Univ.*, 5 F.3d at 668 ("The Plaintiff bears the initial burden ... of showing ... anticompetitive effects within the relevant product and geographic markets").

Plaintiffs also argue that they "have alleged and can show 'the rough contours of a relevant market' i.e., the market for MPT labor." (Pls.' Br. at 21.) Plaintiffs insist that there is one relevant market for all the Plaintiffs. Indeed, Plaintiffs argue that individual labor markets have "no bearing on the conduct challenged in this case." (Pls'. Br. at 1.) In this regard, Plaintiffs' argument is both wrong and contrary to the prior rulings of this Court and the *Todd* court. As the *Todd* court recognized in its analysis under the traditional method, the relevant markets here are the jobs that are reasonably good substitutes for each Plaintiff. While Plaintiffs' decision to use the direct evidence method may alter whether Plaintiffs must precisely define the relevant markets, it simply does not alter the labor markets that are relevant to this antitrust case.[FN6]

> FN6. Notably, Plaintiffs do not argue that they can prove market power by direct evidence in the job markets relevant to the ten individual Plaintiffs in this case. For example, Plaintiffs do not contend that they could show that there was anticompetitive conduct in the labor market applicable to Ms. Todd. Nor do Plaintiffs contend that they can show that the labor market applicable to Ms. Todd is limited to the oil and petrochemical industry.

**B. Evidence Concerning the Individual Plaintiffs**

*9 Defendants set forth, at length, evidence regarding the employment opportunities of each of the named Plaintiffs. (Defs.' Br. at 15-35.) In essence, Defendants argue that each of the individual plaintiffs had "substitutable employment opportunities outside of defendants, and that consequently, 'the market of employment opportunities available to [Plaintiffs]' is not confined to defendants." (Defs.' Br. at 3.) Defendants contend that the employment opportunities outside of the oil and petrochemical industry would use "the same skill set [that Plaintiffs] used at their defendant-employers." (*Id.* at 5.) Plaintiffs contest some of the evidence.

Regardless of these disagreement, the evidence before the Court further demonstrates that the relevant labor markets for the individual plaintiffs are not necessarily limited to the oil and petrochemical industry and in fact vary based upon the individual's qualifications and experience. *See, e.g.,* Declaration of Mark S. Germann in Support of Defendants' Motion for Summary Judgment, Ex. 2, August 28, 1997 Dep. of Roberta Todd at 91-95 (Ms. Todd worked at Exxon as a financial analyst, was trained on SAP's financial software and when she was terminated by Exxon, she had a placement firm "send [her] the resume at that time to any company that was interested in SAP skills"). The Court sees no need to recite the lengthy list of details concerning the employment opportunities available for each of the individual Plaintiffs because, as discussed be-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3887619 (D.N.J.), 2008-2 Trade Cases P 76,438
**(Cite as: 2008 WL 3887619 (D.N.J.))**

low, each Plaintiff's claim fails for the same reason.

### C. Application of Summary Judgment Standard

As the Court concluded above, Plaintiffs are required to prove, at least roughly, the parameters of the specific labor markets relevant to the individual Plaintiffs. Summary judgment is appropriate because Plaintiffs have not offered any evidence that these labor markets are limited to the oil and petrochemical industry and Plaintiffs do not seek discovery on this issue. Therefore, no reasonable jury could find for Plaintiffs.

The Court rejects Plaintiffs' argument that summary judgment is inappropriate because the discovery thus far raises genuine issues of material fact. In support of this contention, Plaintiffs reference various statements by Defendants concerning the total compensation paid to all MPT employees and the average compensation of all MPT employees. (Pls.' Br. at 23-26; Pls.' Ans. to Defs.' Statement of Undisputed Facts and Counterstatement of Disputed and Undisputed Facts, ("Pls.' Statement of Facts") at 6-65). But on summary judgment, the Court will not simply assume that the relevant individual labor markets are limited to the oil and petrochemical industry on the basis of statements that go to all MPT employees. Plaintiffs has offered no other evidence that the labor markets relevant to the individual plaintiffs are limited to the oil and petrochemical industries. Notably, Plaintiffs have not offered evidence that employers in other industries would not be reasonable substitutes for the individual Plaintiffs. Moreover, Plaintiffs have not offered "direct evidence" of anticompetitive effects in the particular relevant markets. In fact, the evidence before the Court on these individual markets indicates that the markets extend in different ways and to different degrees beyond the oil and petrochemical industry. (Defs.' Statement of Undisputed Facts Pursuant to L.Civ.R. 56.1; Pls.' Statement of Facts at 2-5.) Thus, the Court concludes that Plaintiffs do not create a genuine issue of material fact as to whether the market relevant to each remaining Plaintiff is confined to the oil and petrochemical industry.

*10 Similarly, Plaintiffs do not create a genuine issue of material fact as to whether there was an oil industry premium in the relevant labor markets. Plaintiffs simply have not brought forth any evidence of a oil industry "premium" applicable to the individual Plaintiffs, despite the fact that such salary information is likely available through third parties and through the Plaintiffs themselves. Although figures and statements regarding the total or average compensation for all MPT employees involves many job markets, such averages and totals, by their nature, do not provide evidence of the compensation levels in any single Plaintiff's labor market. For similar reasons, Plaintiffs do not create a genuine issue of material fact as to whether there was a reduction in any such oil industry premium in the relevant labor markets. Therefore, Plaintiffs' argument that "the evidence adduced thus far ... supports the proposition that the information exchanges enabled the defendants to align their total pay, and to move it closer to general industry levels" (Pls.' Br. at 23) is not sufficient to stave off summary judgment.

Next, the Court rejects Plaintiffs' contention that summary judgment is inappropriate because Defendants rely "on nothing more than the same facts that the Second Circuit *rejected* as [in]sufficient to defeat plaintiffs' claims." (Pls.' Br. at 2-3.) Courts review summary judgment motions under a different standard than motions to dismiss. Therefore, Plaintiffs's claims will not survive a motion summary judgment merely because the Complaint survived a Rule 12(b)(6) motion.

This Court accepts that Plaintiffs' asserted a plausible theory. *See Todd,* 275 F.3d at 195. The *Todd* court found it plausible for the purpose of ruling on a motion to dismiss that the markets of reasonably substitutable employers for MPT employees would be limited to the oil and petrochemical industry. Indeed, the *Todd* court also found it plausible that the relevant labor markets might be limited to employ-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3887619 (D.N.J.), 2008-2 Trade Cases P 76,438
**(Cite as: 2008 WL 3887619 (D.N.J.))**

ers in the oil and petrochemical industry, despite the fact that the individual Plaintiffs may have been able to find employment outside of the oil and petrochemical industry. *Id.* at 204 & n. 7.

But plausibility is not the standard on a motion for summary judgment. Pursuant to Federal Rule of Civil Procedure 56(e), "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading rather, its response must ... set out specific facts showing a genuine issue for trial." Defendant has properly made a motion for summary judgment and supported it with deposition testimony and other evidence. Plaintiffs do not bring forth evidence sufficient to show that there is a genuine issue for trial.[FN7]

> FN7. Moreover, it is not clear that the evidence put forth by Defendants was before the Second Circuit in *Todd.* Although the parties dispute the precise extent of discovery that has taken place, there was some degree of discovery in the *Todd v. Exxon* matter after the Second Circuit remanded the matter. (56(f) Aff. at 2; Defs.' Reply Br. at 14 n. 4.) Moreover, in this consolidated action, the parties have conducted class discovery, which included depositions of the individual plaintiffs.

**D. 56(f) Affidavit**

Finally, Plaintiffs have failed to identify with specificity any discovery that would result in the denial of summary judgment.

**\*11** The Court is aware that merits-based discovery has not, for the most part, been permitted to proceed. In the context of Rule 12(b) (6) motions to dismiss, the Supreme Court has warned that "in antitrust cases ... dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 746 (1976). Similar con-

cerns apply to this case. In fact, the Third Circuit has repeatedly "criticized the practice of granting summary judgment motions at a time when pertinent discovery requests remain unanswered by the moving party." *Lunderstadt,* 885 F.2d at 70 (internal quotations and citations omitted). Thus, "[i]f discovery is incomplete in any way material to a pending summary judgment motion, a district court is justified in not granting the motion." *Abington Friends School,* 480 F.3d at 257 (citation omitted). However, the Supreme Court recently noted that "[i]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1966-67 (2007). Moreover, a "district court has discretion in acting on Rule 56(f) motions." *Horvath,* 333 F.3d at 458 (internal quotations and citations omitted).

In their brief and Rule 56(f) Affidavit, Plaintiffs outline a number of topics on which they wish to take discovery, namely "what occurred during the Oil [I]ndustry Roundtable Meetings and other face-to-face meetings among defendants' senior compensation executives," "discovery of the 'direct exchanges' among defendants," discovery regarding "whether defendants acting collectively, were able to slow down the rate of industry salary growth," and discovery regarding "the nature and scope of the information exchanges; the purpose and effect of the exchanges' [and] whether there was any agreements [sic] among defendants concerning the use of the information." (Pls.' Br. at 10-11; Rule 56(f) Affidavit of Ellen Meriwether ("56(f) Aff.") at 7-8, 12.) Plaintiffs argue that this "additional merits discovery ... would demonstrate that defendants' exchanges of information facilitated the co-ordination of their MPT compensation levels at ranges below the ranges that which would have prevailed in a truly competitive market." (56(f) Aff. at 11.) Plaintiffs also request "information as to what transpired at the face-to-face meetings among defendants' senior compensation executives and in the direct exchanges of information among the defend-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 3887619 (D.N.J.), 2008-2 Trade Cases P 76,438
**(Cite as: 2008 WL 3887619 (D.N.J.))**

ants." (*Id.* at 12.) Plaintiffs claim this discovery "will create additional genuine issues of material [fact] as to whether defendants entered into an agreement ... that ... would subject the defendants to liability under the *per se* rule." (*Id.*) At oral argument, Plaintiffs clarified that all of their 56(f) discovery requests go to their theory of a single market for all MPT employees, and not to the employee-specific markets.

**\*12** Defendants argue that "Plaintiffs' discovery requests are pretextual" and that "the discovery that they seek ... is irrelevant to this narrowly focused summary judgment motion." (Defs.' Reply Br. at 13-14.) Moreover, Defendants argue that the requested discovery could not demonstrate Plaintiffs' "(i) industry-specific expertise, (ii) outside job opportunities, or (iii) unsubstantiated MPT employee labor market." (*Id.* at 14.)

First, the Court rejects Plaintiffs' request for discovery regarding the existence of a price-fixing agreement that would be subject to *per se* condemnation. Such discovery would be, as Defendants' contend, "an eleventh hour (or eleventh year) fishing expedition." (Defs.' Reply Br. at 15) Plaintiff simply has not previously alleged that this case involved any *per se* violations, much less a price-fixing agreement. *See* Op. on Mot. for Class Certification, dated May 27, 2003 (Docket No. 82) at 5 ("Plaintiffs' antitrust action is brought under the rule of reason theory as opposed to the *per se* theory"); *Todd*, 275 F.3d at 199 ("plaintiff does not allege an actual agreement among defendants to fix salaries").[FN8] Therefore, the Court will not allow such discovery.

> FN8. At oral argument, Plaintiffs seemingly conceded this point by acknowledging that they were not alleging the existence of an agreement subject to *per se* condemnation.

Second and more importantly, the Court fails to see how any of the discovery requests, which, Plaintiffs admit, all go to a single market for all MPT employees, would prevent summary judgment.

Plaintiffs' discovery requests simply do not address the markets that the *Todd* court recognized as being relevant to the individual plaintiffs. The requested discovery also does not address whether there was a premium in these particular labor markets. Moreover, the requested discovery does not address whether Defendants reduced these alleged premiums, much less whether Defendants were able to collectively reduce the premiums while retaining the employees in the relevant labor markets. Thus the Court concludes that such discovery would not enable a reasonable jury to find for Plaintiffs.

Thus, the Court concludes that in Plaintiffs' Rule 56(f) affidavit is not sufficient to prevent summary judgment.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment. An appropriate form of order is filed herewith.

D.N.J.,2008.
In re Compensation of Managerial, Professional and Technical Employees Antitrust Litigation
Not Reported in F.Supp.2d, 2008 WL 3887619 (D.N.J.), 2008-2 Trade Cases P 76,438

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

**C**

United States District Court,
D. New Jersey.
Ted M. ROSENBERG et al., Plaintiffs,
v.
JCA ASSOCIATES, INC. et al., Defendants.
**Civil No. 03-0274 (JBS).**

March 30, 2007.

Gregg L. Zeff, Esq., Michael C. Ksiazek, Esq., Frost & Zeff, Cherry Hill, NJ, for Plaintiffs.

Lawrence W. Lindsay, Esq., Justin T. Loughry, Esq., Loughry & Lindsay, Moorestown, NJ, for Defendant JCA Associates, Inc.

Jeffrey Zucker, Esq., Sufrin, Zucker, Steinberg, Waller & Wixted, PC, Camden, NJ, for Defendant Mark Neiss-er.

Morris W. Pinsky, Esq., Westmont, NJ, for Defendant Henry Chudzinski.

William M. Tambussi, Esq., William F. Cook, Esq., Brown & Connery, LLP, Westmont, NJ, for Defendant George Norcross, III.

Mark W. Cantanzaro, Esq., Moorestown, NJ, for Defendant R. Louis Gallagher, II.

***OPINION***

SIMANDLE, District Judge.

| I. | | | BACKGROUND | 6 |
|---|---|---|---|---|
| | A. | | The 2000 Election of the BCDC Chairman | 8 |
| | B. | | The Events After June 2000 BCDC Election | 10 |
| | | 1. | Rosenberg's Position as Solicitor of Palmyra | 12 |
| | | 2. | Gural's Employment at JCA Associates | 12 |
| II. | | | PROCEDURAL HISTORY | 14 |
| III. | | | DEFENDANTS' MOTION FOR SUMMARY JUDGMENT | 17 |
| | A. | | Summary Judgment Standard of Review | 17 |

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

| B. | Preliminary Matters | | 18 |
|----|---------------------|---|----|
| | 1. | Plaintiffs' Rule 56(f) Affidavit | 18 |
| | 2. | Plaintiffs' Failure to File a Statement of Material Facts under Local Civil Rule 56.1 | 25 |
| | 3. | Whether Plaintiff Gural's Claims against Defendants Norcross and Gallagher are Barred by the New Jersey Entire Controversy Doctrine | 27 |
| C. | Plaintiffs' RICO Claims | | 30 |
| | 1. | Plaintiffs' have Failed to Demonstrate Harm to their Business or Property | 31 |
| | 2. | Defendants are Entitled to Summary Judgment as to Plaintiffs' Federal RICO Claims | 36 |
| D. | Remaining State Law Claims Brought by Both Plaintiffs | | 36 |
| | 1. | New Jersey RICO | 38 |
| | 2. | Tortious Interference with Business Relations | 39 |
| | | a. | Political Patronage Positions | 41 |
| | | b. | Gural's Employment at JCA As- | 43 |

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
(Cite as: 2007 WL 1038893 (D.N.J.))

Page 3

|   |   |   | sociates |   |
|---|---|---|---|---|
|   | 3. | | Civil Conspiracy Claims | 45 |
|   | 4. | | Gural's Claims for Intentional Infliction of Emotional Distress | 46 |
|   | 5. | | Eleanor Gural's Claims for Loss of Consortium | 48 |
| IV. | DEFENDANTS' MOTION FOR ATTORNEY'S FEES AND SANCTION | | | 49 |
|   | A. | Rule 11 Motion Against Plaintiff Gural's Counsel | | 52 |
|   | B. | Rule 11 Motion Against Plaintiff Rosenberg | | 53 |
| V. | CONCLUSION | | | 54 |

**\*1** This matter involves allegations of corruption, extortion and retaliation for political disloyalty surrounding the Burlington County Democratic Party and the Burlington County Democratic Committee elections in 2000. Presently before the Court are motions filed by defendants Mark Neisser, Henry Chudzinski, George Norcross, III, R. Louis Gallagher, II, and JCA Associates, Inc. (collectively, the "Defendants") (1) for summary judgment against plaintiffs Ted M. Rosenberg and against John J. Gural, Jr. and Eleanor Gural (collectively, the "Plaintiffs"); (2) to relax the briefing page limitations imposed by Local Civil Rule 7.2(b) for Defendants' motions for summary judgment; and (3) for fees and sanctions pursuant to Rule 11, Fed.R.Civ.P. FN1

> FN1. Defendant Norcross has filed separate motions for summary judgment directed at Plaintiffs Rosenberg and John and Eleanor Gural [Docket Item Nos. 122 and 123, respectively.] The other four defendants (Neisser,

Gallagher, Chudzinski and JCA Associates, Inc.) have each joined in Defendant Norcross' motions and relied on his briefing papers. [Docket Item Nos. 125, 126, 127, 129, 130, and 132 .] The Court has also received and will consider a February 22, 2006 letter from counsel for JCA Associates in support of JCA Associate's motion for summary judgment. (Letter from Justin Loughry, Esq., dated 2/22/06.)[Docket Item No. 156.]

Defendant Norcross also filed a motion for fees and sanctions on December 22, 2005. [Docket Item No. 134.] The other four defendants (Neisser, Gallagher, Chudzinski and JCA Associates, Inc.) have each joined in Defendant Norcross' motion for fees and sanctions and have again relied on his briefing papers. [Docket Item Nos. 135, 136, 138 and 141.]

Finally, Defendant Norcross filed a motion to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
(Cite as: 2007 WL 1038893 (D.N.J.))

bar consideration of any opposition filed in response to Defendant Norcross' motion for summary judgment. [Docket Item No. 143.] This motion was predicated on the belief that Plaintiffs had failed to file timely opposition. Because Plaintiffs did file opposition in a timely manner, Defendant Norcross' motion to bar consideration of opposition will be denied.

The central arguments made by Defendants in their motions for summary judgment are (1) that Plaintiffs' claims under the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, *et seq.*, ("RICO") are without merit as Plaintiffs cannot prove damages, causation or that the Defendants did any predicate acts to trigger a RICO claim and (2) that the Court will lack jurisdiction to hear state law claims after dismissing the federal RICO action or, in the alternative, that Plaintiffs' claims under state law are without merit. Defendants also argue that, because Plaintiff Gural brought a similar claim against Defendants JCA Associates, Chudzinski and Neisser in 2001 under New Jersey's CEPA, Gural's claims against Defendants Norcross and Gallagher are now barred under the New Jersey Entire Controversy Doctrine ("NJECD"). While Plaintiffs do address some of the arguments raised in Defendants' motions, Plaintiffs' central argument is that summary judgment is premature at this stage of the litigation because discovery is not yet complete and Plaintiffs request that this Court allow them time for additional discovery under Rule 56(f), Fed.R.Civ.P.

At the outset, the Court will grant Defendants' motion to relax Rule 7.2(b), L. Civ. R. and allow Defendants' briefs in support of their respective motions for summary judgment to exceed the 40 page maximum. Defendants' motions address a number of complex issues that require extensive briefing. In addition, Defendant Norcross' motions speak for all five Defendants. As such, relaxation of Rule 7.2(b) is warranted.

With respect to Defendants' motions for summary judgment, for the reasons expressed below, this Court will grant Defendants' motions with respect to the federal RICO claims brought by both Plaintiffs (Counts II-V

and X-XIII of the First Amended Complaint ("FAC")) because neither Rosenberg nor Gural have demonstrated that they have suffered any harm to their "business or property" as a Plaintiff is required to show under the federal RICO laws. In addition, the Court shall (1) retain jurisdiction over Plaintiffs' additional state law claims; (2) grant Defendants' summary judgment motions as to Rosenberg's and Gural's state law claims of New Jersey RICO (Counts VII and XV) and civil conspiracy claims (Counts VIII and XVII) and Rosenberg's claim of tortious interference with contract and business relationships (Counts I); and (3) grant Defendants' motion as to John Gural's claim of intentional infliction of emotional distress (Count XVI) and Eleanor Gural's claim of loss of consortium (Count XVIII.) The Court, however, will deny the motions for summary judgment of Defendants Norcross and Gallagher with respect to Gural's tortious interference with contract and business relationships (Count IX). Furthermore, this Court rejects Plaintiffs' request for a continuance in order to allow additional discovery under Rule 56(f) because Plaintiffs have failed to demonstrate how additional discovery (e.g., depositions of Defendants) would alter the outcome of Defendants' motions for summary judgment, and why discovery was not concluded within the lengthy period available to have done so. Of course, discovery will proceed with respect to Gural's tortious interference claim, the sole remaining claim in this case.

*2 Finally, this Court will deny Defendants' motion for Rule 11 sanctions against Plaintiff Gural's counsel and Plaintiff Rosenberg.

*I. BACKGROUND*

Plaintiff, Ted M. Rosenberg has been an active Democrat since the late 1980s having represented numerous municipalities as either a prosecutor and solicitor. (First Amended Compl. "FAC" ¶ 50 and Def.'s Br. at Ex. A, Deposition Transcript of Ted. M. Rosenberg, at 496-500.) In 1999, Rosenberg was the solicitor for the Borough of Palmyra and Chairman of the Democratic Party in Medford Township, Burlington County in 1999. (FAC ¶¶ 5, 15; Rosenberg Dep. Tr. at 342, Def.'s Br. at Ex. A.6.) During this time, Plaintiff John J. Gural,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

Jr., an employee of defendant JCA Associates, Inc.[FN2] and a councilman of the Borough of Palmyra, asked Rosenberg to consider running for the Chairmanship of the Burlington County Democratic Committee (the "BCDC".)[FN3] (FAC ¶¶ 6, 16.) Plaintiffs Rosenberg and Gural say that they then met with Defendants Mark Neisser and Henry Chudzinski, both shareholders and principals of JCA Associates, to discuss Rosenberg's candidacy.[FN4] Gural says that Neisser told him that JCA would support Rosenberg provided that Defendant Norcross approved.[FN5] (Id. ¶ 19.) Plaintiffs allege that JCA maintained a close business relationship with Norcross, with JCA making substantial political donations to political candidates at Norcross' request in exchange for municipal engineering business from governmental entities with political ties to Norcross. (Id. ¶¶ 20-22.) Through this arrangement, Plaintiffs allege that Defendant Norcross controlled the activities of JCA.

> FN2. JCA Associates is an engineering firm located in Moorestown, Burlington County, New Jersey.

> FN3. Approximately 500-600 members of the Burlington County Democratic Committee vote for the position of chairman. (Rosenberg Dep. Tr. at 651-52.)

> FN4. JCA Associates provides services to a number of South Jersey municipalities and public agencies.

> FN5. Norcross is the former Chairman of the Camden Democratic Committee and the CEO and President of Commerce National Insurance Services, Inc.

### A. The 2000 Election of the BCDC Chairman

In January 2000, when Rosenberg was seeking to run for office, there was also a Democratic primary United States Senate race underway involving Jon Corzine (presently New Jersey's Governor) and former New Jersey Governor James Florio as the two main Democratic contenders. (Id. ¶ 24.) Rosenberg says that Norcross asked him to support Florio, but that he refused. Rosenberg alleges that his refusal to support Florio prompted Neisser and Chudzinski to inform Gural that Norcross would probably not allow JCA Associates to support Rosenberg's candidacy for chairman of the BCDC. (Id. ¶¶ 25, 26.) By February 2000, Neisser and Chudzinski informed Gural that neither they nor JCA Associates would support Rosenberg for the chairman position. (Id. ¶ 27.)

Despite this lack of support, on February 14, 2000, Rosenberg publicly declared his candidacy for BCDC Chairman.[FN6] (Id. ¶ 28; Rosenberg Dep. Tr. at 524.) Gural alleges that Norcross conveyed to him, through Neisser and Chudzinski, that Gural should not support Rosenberg. (Id. ¶ 29-30.) Despite this warning, Gural supported Rosenberg. (Id. ¶ 31.) On March 2, 2000, Gural says that he informed Neisser and Chudzinski that his local Democratic organization intended to publicly endorse Rosenberg's candidacy. (Id. ¶ 32.) In response, Chudzinski allegedly indicated to Gural that Gural's job would be in jeopardy if he did so. (Id.) Gural then contacted Carol Riener, Chairperson of the Palmyra Democratic Committee, and informed her that his job was threatened if he openly endorsed Rosenberg, and Gural began to tape record the conversations he had with Neisser, Chudzinski, Norcross and Rosenberg. (Id. ¶¶ 36-38.) Later in March 2000, Defendant R. Louis Gallagher, II announced that he would run opposite Rosenberg for the BCDC Chairman position. (Id. ¶ 33.)

> FN6. Before deciding to run for the chairman's position, Rosenberg was not active in Burlington County politics. (Rosenberg Dep. Tr. at 524-25, 651.)

*3 From his deposition testimony, it appears that from the start, Rosenberg's campaign was run less than efficiently. (Rosenberg Dep. Tr. at 652-55 and 662-67.) Rosenberg admits that he never formed a formal committee to support his election efforts, kept track of campaign donations, or obtained a complete list of names and phone numbers of the 500 to 600 individuals who would vote for the BCDC chairmanship. (Id.) Rosenberg did some campaigning, however, delivering campaign literature to approximately 550 elected county committee persons in Burlington County, which in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
(Cite as: 2007 WL 1038893 (D.N.J.))

cluded a flow chart that portrayed Norcross in a negative light.[FN7] (Rosenberg County Chairman Campaign Literature, Def.'s Br. at Ex. F.)

> FN7. The flow chart implied that Norcross (in conjunction with Gallagher and JCA) used his influence with the Burlington County Democratic Party to grow his insurance and banking business, that he had obtained business from publicly controlled entities in Burlington County, and had been instrumental in awarding millions of dollars of "no bid" contracts to various professional firms. (*Id.* ¶¶ 38-40; *see also* Def.'s Br. at Ex. F.)

Gural alleges that immediately after Rosenberg distributed the flow chart, Defendants Neisser and Chudzinski again threatened him for his public support of Rosenberg. (*Id.* ¶ 42.) Specifically, on June 6, 2000, Neisser and Chudzinski repeatedly suggested that he should support the candidacy of Gallagher and requested that he sign a letter supporting Gallagher. (*Id.* ¶¶ 44-46.) Gural refused. (*Id.*) In addition, Gural was told by Neisser that if he did not ensure that Palmyra's Democratic County Committee persons would be voting for Gallagher, his job with JCA would be in jeopardy. (*Id.* ¶ 47.) Gural claims that he did, in fact, advise several of his Palmyra County committee persons to support Gallagher because he feared that he would lose his job if he did not. (*Id.* ¶ 48.) Rosenberg lost the election to Gallagher by a vote of 247 to 220. (*Id.* ¶ 50.)

**B. The Events After June 2000 BCDC Election**

Plaintiffs say that Norcross then directed his efforts toward having Rosenberg removed from his position as solicitor of the Borough of Palmyra. They allege that he had Neisser, Chudzinski and others pressure Gural, as councilman in Palmyra, to arrange for Rosenberg's termination and threaten that he would lose his employment with JCA if he did not comply. (*Id.* ¶¶ 18, 51-52, 59, 68-69, 81.) Defendants dispute this, citing a February 9, 2001 memorandum from Neisser to Gural stating that Gural's employment at JCA was in no way contingent upon Gural's position regarding Rosenberg's re-

appointment. (Memorandum from Neisser to Gural, dated 2/9/01, Def.'s Br. at Ex. JJ.)

In January 2001, Gural says that he and Neisser met with Norcross and that Norcross told him that he hated Rosenberg, that he wanted to ruin his career, and that he wanted him fired as the solicitor of Palmyra. (*Id.* ¶¶ 90-95; Transcript of 1/31/01 taped conversation between Norcross, Gural and Neisser, Def.'s Br. at EE.) Gural tape-recorded the conversation. (Tr. of 1/31/01 meeting; Certification of John J. Gural ¶ 25-27, Pl.'s Opp. Br. at Ex. A.) According to the transcript of the recorded conversation, Gural told Norcross that he wanted to be appointed to the Burlington County Board of Elections in exchange for terminating Rosenberg and that Norcross said that he would talk to Gallagher about getting Gural the position. (*Id.* at 46-48.) [FN8]

> FN8. Gural alleged (and a transcript of his recordings confirm) that Gallagher later told him that the Board of Elections position had already been promised to another person, but that Neisser and Chudzinski continued to talk to Gural about other forms of compensation, including payment from JCA, in exchange for his efforts in attempting to terminate Rosenberg's position as solicitor of Palmyra. (*Id.* ¶¶ 98-100.)

**1. Rosenberg's Position as Solicitor of Palmyra**

*4 Rosenberg acknowledged that his position as solicitor of Palmyra was an annual appointment and that he could be replaced on an annual basis. (Rosenberg Dep. Tr. at 342.) The appointment of borough solicitor is made by the mayor and borough council of Palmyra and thus, Rosenberg understood that there is no guarantee that he would be appointed as solicitor in a given year. (*Id.* at 342-44.) Despite alleged attempts by Norcross and the Defendants to have Rosenberg fired as the borough solicitor, on February 10, 2001, the Palmyra Borough Council unanimously approved Rosenberg as solicitor. Gural abstained from the vote. (*Id.* ¶ 109.)

**2. Gural's Employment at JCA Associates**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

After Rosenberg was reappointed as solicitor of Palmyra, Gural alleges that the Defendants conspired to harm both his business and political careers. First, Gural alleges that he was constructively discharged from employment at JCA in October of 2001 and that this action stemmed directly from his failure to prevent the reappointment of Rosenberg as solicitor to Palmyra. (*Id.* at 11, 183, 188.) After his discharge, Gural alleges that he was unable to find employment in South Jersey as a political consultant or project manager. (*Id.* at ¶ 202.) Defendants point out, however, that in 2002, Gural earned $60,000 ($15,000 more than his yearly salary at JCA Associates) at Stanker and Galetto, a general contractor based in Vineland, New Jersey. (Deposition Transcript of John Gural at 75-76; Def's Br. at Ex. G.)

In June of 2001, Gural filed a civil action in Superior Court of New Jersey under the New Jersey Conscientious Employee Protection Act ("CEPA") naming JCA, Neisser and Chudzinski as Defendants and claiming that Neisser and Chudzinski retaliated against Gural for supporting Rosenberg's campaign for BCDC Chairman's position in early 2000 and his failure to prevent Rosenberg's reappointment as solicitor to Palmyra.) (*Gural v. JCA Associates,* Def.'s Br. at LL.) Defendant Norcross was not named as a defendant in the action. The matter was settled in late 2001 with Gural being paid $132,000 as part of the settlement. (Gural Dep. Tr. at 30-32, Def's Br. at Ex. LL.)

Second, Gural alleges that Defendants took adverse action against him politically. In 2002, while running for Burlington County freeholder, Gural alleges that Defendants directed in excess of $50,000 to his political opponents in order to defeat him in the primary. (*Id.* at ¶ 209; Gural Cert. ¶ 16, 17; Pl.'s Opp. Br. at Ex. A.) In 2003, Gural ran for Mayor of Palmyra. (*Id.* at ¶ 210.) Gural claims that a number of individuals he approached for political donations refused, fearing retaliation from Norcross. (Gural Cert. ¶ 4, 6, 22.) Among them was Pennoni Associates, an engineering firm who allegedly stated that a $500,000 contract that Pennoni had with the New Jersey Department of Transportation and Palmyra would be revoked. Gural also contends that Defendants retaliated against his political allies

(including Robert Stewart, CPA who was fired as auditor of Township of Magnolia) and shut him out of all county political events and fund raisers. (*Id.* at ¶ 8, 9.) Despite the alleged actions on the part of Defendants to hurt Gural's political career, Gural was elected mayor of Palmyra in 2004.[FN9]

> FN9. Norcross includes a lengthy discussion in his brief in support of his motion and its Statement of Material Facts that are irrelevant to the pending matter. Specifically, Defendants have included a lengthy description of Rosenberg's mental health and the head injuries he sustained in a 1996 car accident. Defendants also discuss Rosenberg's political patronage appointments (where he served as solicitor or prosecutor for a municipality or government organization). Third, Defendants include a lengthy discussion regarding Gural's financial difficulties including a number of tax and real estate judgments (Def.'s Br. at Ex. G, H and K), liens (*id.* at N.), and loan judgments filed against him in New Jersey and Pennsylvania. (*Id.* at H and L.) Finally, the Statement of Material Facts includes a large section regarding Rosenberg's dealings with the New Jersey Division of Criminal Justice which was investigating certain actions of Norcross. While some of these facts were raised presumably to show that Rosenberg and Gural's political careers suffered as a result of "self-inflicted wounds" (as counsel for Norcross stated at oral argument), none of these facts are particularly relevant to the present matter before the Court.

## II. PROCEDURAL HISTORY

*5 On January 21, 2003, Plaintiffs filed an eighteen count Complaint against the four individual Defendants and JCA Associates, Inc. Soon after, Defendants moved to dismiss. On December 31, 2003, this Court issued an opinion denying Defendants' motion and required Plaintiffs to provide greater specificity on their RICO claims. *See Rosenberg v. JCA Associates,* 03-274, slip. op. at 20 (December 31, 2003.) Plaintiff filed a First

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
(Cite as: 2007 WL 1038893 (D.N.J.))

Amended Complaint ("FAC") and a RICO Case Statement on January 30, 2004.

Plaintiffs' FAC asserts the following counts as to Rosenberg and Gural, respectively: tortious interference with contract and business relationships (Counts I and IX); extortion in violation of RICO, 18 U.S.C. § 1962(b), (Counts II and X); bribery in violation of RICO, 18 U.S.C. § 1962(b) (Counts III and XI); participation in a RICO enterprise, 18 U.S.C. § 1962(c) (Counts IV and Count XII); conspiracy in violation of RICO, 18 U.S.C. § 1962(d) (Counts V and Count XIII); New Jersey RICO-N.J. Stat. Ann. 2C:41-2, *et. seq.* (Counts. VII and Count XV); and civil conspiracy (Counts VIII and XVII). The FAC also asserts claims for intentional infliction of emotional distress (Count XVI, by Gural) and loss of consortium (Count XVIII, by Eleanor Gural). Plaintiff Gural's Complaint does not include claims against Defendants, Mark Neisser, Henry Chudzinski or JCA Associates, Inc.[FN10]

> FN10. Prior to the filing of this lawsuit, Plaintiff Gural brought a claim against JCA, Neisser and Chudzinski in state court that is substantially similar to the claims asserted here. (Confidential Settlement Agreement, ¶ 13-Def. Exhibit B; Def.'s Statement of Material Facts ¶¶ 463-520.) While it appears that Defendants are under the impression that Gural has named Neisser, Chudzinski and JCA as defendants (along with Norcross and Gallagher) in Counts IX-XVIII, the Court does not consider Gural to have brought his claims against JCA, Neisser and Chudzinksi. Further, if Plaintiffs had, Plaintiffs conceded at oral argument that Gural's claims against these three defendants must be dismissed. The Court, however, had doubts that Gural ever properly brought such claims against these three Defendants. The FAC states that Rosenberg brings his claims as to "all Defendants" whereas Gural brings his claims as to "Defendants, George Norcross and R. Louis Gallagher." Second, in their opposition brief, Plaintiffs do not specifically argue that Gural has any claims

against JCA, Neisser and Chudzinksi, instead only arguing that the New Jersey Entire Controversy Doctrine does not bar Plaintiffs' claims against Norcross and Gallagher. In any event, Gural has brought no claims herein against JCA, Neisser or Chudzinski.

Discovery on this matter has been ongoing for over two years under the supervision of U.S. Magistrate Judge Ann Marie Donio. During that time, the parties have had numerous discovery disputes and Judge Donio has had numerous status conferences. On December 1, 2005, Defendant Norcross filed a motion for summary judgment against Plaintiffs. All Defendants joined Defendant Norcross' motion and rely on the arguments made in his briefs filed in support of the motions. On January 27, 2006, Plaintiffs filed opposition to Defendants' motions to which Defendants replied on February 7, 2006. This Court heard oral argument on Defendants' motions for summary judgment on March 2, 2006. In addition, on December 22, 2005, Defendant Norcross filed a motion for fees and sanctions under Fed.R.Civ.P. 11 to which all Defendants joined, which is addressed in Part IV, below.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).[FN11] In deciding whether there is a disputed issue of material fact, this Court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. *See Hunt v. Cromartie,* 526 U .S. 541, 552 (1999) (citing *Liberty Lobby,* 477 U.S. at 255). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby,* 477 U.S. at 250; *Brewer v. Quaker State Oil Refining Corp .,* 72 F.3d 326, 329-30 (3d Cir.1995) (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
(Cite as: 2007 WL 1038893 (D.N.J.))

FN11. A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.*

*6 The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

However, where the nonmoving party bears the burden of persuasion at trial, as plaintiff does in the present case, "the burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The non-moving party "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue. Fed.R.Civ.P. 56(e). Plaintiff must do more than rely only "upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985), *cert. denied,* 474 U.S. 1010 (1985) (citation omitted) Thus, if the plaintiff's evidence is a mere scintilla or is "not significantly probative," the court may grant summary judgment. *Liberty Lobby,* 477 U.S. at 249-50.

**B. *Preliminary Matters***

Before addressing the substance of Defendants' motion for summary judgment and sanctions, this Court must address three preliminary issues.

**1. Plaintiffs' Rule 56(f) Affidavit**

First, the Court will address Plaintiffs' arguments that, since discovery is not yet complete, summary judgment is premature. (Pl.'s Opp. at 12.) Deciding this preliminary issue is critical to this Court's disposition of Defend-

ants' summary judgment motions because, according to Plaintiffs, the fact that discovery is incomplete precludes this Court from granting Defendants' motions on the merits.

Under Fed.R.Civ.P. 56(f), a party may oppose a motion for summary judgment by submitting an affidavit that sets forth good reasons why the party cannot submit an affidavit justifying the party's position in opposition to the motion.[FN12] *See Robert E. Bartkus, N.J. Federal Civil Procedure* ¶ 8-12:4 at 212-13 (1999). Upon review of a Rule 56(f) affidavit, the court may refuse to entertain the pending summary judgment motion or may order a continuance to permit additional discovery. "[W]here the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course." *Miller v. Beneficial Mgmt. Corp.,* 977 F.2d 834, 846 (3d Cir.1992); *Doe v. Abington Friends Sch.,* 2007 U.S.App. LEXIS 5945 at *16-18 (3d Cir.2007).[FN13] However, in deciding whether to grant a Rule 56(f) motion, the Court must consider "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not been previously obtained." *San Filippo v. Bongiovanni,* 30 F.3d 424, 432 (3d Cir.1994); *see also Bradley v. United States,* 299 F.3d 197, 206 (3d Cir.2002). "[I]f a court determines that the non-moving party has been afforded sufficient time for discovery, then the court can require that party to proffer its evidence and proceed with the motion." Bartkus, *N.J. Federal Civil Procedure* ¶ 8-12:4 at 213. The decision to grant a Rule 56(f) motion lies in the sole discretion of the district court. *See San Filippo,* 30 F.3d at 432; *see also Koplov v. Ford Motor Co.,* 795 F.2d 15, 18 (3d Cir.1986)("[D]istrict judge's refusal to postpone consideration of defendant's summary judgment motion was well within the range of permissible discretion.") Moreover, a request for relief under Rule 56(f) is "extremely unlikely to succeed" when the party seeking the delay "has failed to take advantage of discovery." *Koplov,* 795 F.2d at 18 (quoting 10A C. Wright, A. Miller, M. Kane, *Federal Practice and Procedure* § 2741 at 553 (1983))("To require less is to deprive trial judges of the ability to effectively manage the cases on their overcrowded dockets.")

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

FN12. Specifically, Rule 56(f) provides in pertinent part that:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

FN13. In *Doe v. Abington Friends School*, the Third Circuit Court of Appeals vacated the district court's grant of summary judgment in favor of defendants, holding that the district court contravened Fed.R.Civ.P. 56(f). *See* 2007 U.S.App. LEXIS 5945 at *1 (3d Cir.2007). Specifically, the Third Circuit held that the district court erred in not granting plaintiffs' motion for a continuance pursuant to Rule 56(f) where (1) plaintiffs had identified six areas of inquiry relevant to the issues presented at summary judgment where discovery was needed and (2) plaintiffs had requested of defendants, but had not been provided with, documents that may have shed light on the issues presented at summary judgment. *Id.* at *16-17. The court also held that they would not fault plaintiffs for failing to provide affidavits relating to facts and information that is "principally within the control of [the defendants] and which [plaintiffs] could only have known second-hand." *Id.* at 17, n. 8.

*7 Counsel for Plaintiffs attaches a Rule 56(f) affidavit to its opposition papers stating that discovery is grossly incomplete largely because Defendants' responses to discovery requests were "wholly inadequate and incomplete" and that Plaintiffs have not had the opportunity to depose Defendants. (Pl.'s Opp. Br. at Ex B., Affidavit of Gregg L. Zeff ¶ 5-8). In the affidavit and at oral argument, Plaintiffs highlight numerous areas where discovery is incomplete, allegedly preventing them from fully responding to Defendants' motions. First, Plaintiffs seek to take the deposition of Defendants in order to fully develop certain facts such as (1) the damages Plaintiffs suffered to their political careers and respective businesses "as a direct result of Defendants' racketeering acts," (Zeff Aff. ¶ 9), and (2) the loss of political appointments and political influence each Plaintiff has suffered. (*Id.* ¶ 10(1)(e).) Plaintiffs argue that these depositions were not taken during discovery because, as memorialized in Judge Donio's May 19, 2004 scheduling order, the parties agreed that the deposition of Plaintiffs would take place before those of Defendants. [Docket Item No. 55.] Next, Plaintiffs argue that discovery is incomplete because Plaintiffs need to take depositions of certain third-parties-such as John Kocybinski (successful chairmanship candidate), Robert Stewart (auditor of Palmyra), the 14 or so voters that Gural contends he would have persuaded to vote for Rosenberg in the 2000 BCDC chairmanship elections if not for the influence of Defendants, and various South Jersey engineering firms (including Pennoni Associates, Inc.) that have informed Gural that they cannot contribute to political campaigns associated with him or Palmyra-are necessary. (*Id.* ¶ 10(2)-(11)).)

In opposition to Plaintiffs' argument, Defendants contend that Plaintiffs have not met their burden of showing why summary judgment is premature. (Def.'s Reply Br. at 2-3.) Instead, according to Defendants, Plaintiffs seek additional discovery in order to "turn this litigation into an all-out political circus." (*Id.* at 3.)

This Court will deny Plaintiffs' request for a continuance under Rule 56(f) for several reasons. First, Plaintiffs have failed to explain why the information they state is critical to the pending motions was not sought during discovery. Indeed, Defendants' filing of their summary judgment motions is consistent with Judge Donio's management of the case under Fed.R.Civ.P. 16 in which Judge Donio gave the parties considerable time to conduct discovery.[FN14] If Plaintiffs were having difficulty obtaining discovery from Defendants the proper course of action would have been to file a motion to compel or to raise the issue with

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

Judge Donio at her frequent status conferences rather than waiting until Plaintiffs' opposition to summary judgment motions to raise these issues with the Court. Moreover, Plaintiffs appear to have conceded that the timing of Defendants' summary judgment motions was appropriate as Plaintiffs themselves had previously indicated to the Court (as early as April, 2005) that summary judgment motions were appropriate at *that* time. (Pl.'s Memo of Law in Opp. to Mot. for Limited Discovery, at 8-9 [Docket Item No. 82].)

> FN14. In support for their position, Defendants cite *Watson v. City of Salem,* 934 F.Supp. 643 (D.N.J.1995)(after analyzing a party's Rule 56(f) motion, the district court rejected a Rule 56(f) argument placing great weight on the magistrate judge's use of the prospective filing of a summary judgment motion to control the litigation). Defendants contend that given Magistrate Judge Donio's same objectives, *Watson* merits rejection of Plaintiffs' argument that summary judgment is premature.

*8 Second, this Court is not compelled to grant a plaintiff's request for a continuance in this case "as a matter of course" (as established in the Third Circuit's decision in *Miller v. Beneficial Mgmt. Corp.*) because here, unlike in *Miller,* the facts Plaintiffs seek are *not* in the possession of the moving party. *Miller,* 977 F.2d at 846. For example, the Court does not agree that Plaintiffs needed to take the depositions of Defendants in order prove that Plaintiffs themselves suffered damage to their political and business careers. Certainly Plaintiffs are in a better position to provide such evidence to the Court (either in the form of an affidavit or certification of the Plaintiffs themselves or of other witnesses available to them) of the harm they have suffered. Furthermore, the agreement between the parties to depose Defendants only after depositions of Plaintiffs are complete did not preclude Plaintiffs from deposing third parties such as Robert Stewart, John Kocybinski, Pennoni Associates, of any of the 14 voters that may have voted for Rosenberg for the chairmanship, in order to provide evidence in support of Plaintiffs' claims. Plaintiffs could have deposed these individuals or sought affidavits or certifications from them on these points during the more than two years during which discovery was ongoing.

Finally, Plaintiffs have failed to persuade the Court that any of the information sought, "if uncovered ... would preclude summary judgment...." *San Filippo,* 30 F.3d at 432. As the Court discusses in Section III.C *infra,* central to Defendants' motion is the argument that Plaintiffs cannot prove that they suffered any harm as a result of Defendants' alleged activities. Generally, whether a plaintiff is damaged is an issue within the peculiar knowledge of the plaintiff. It is a plaintiff's duty to monetize the harm he or she claims to have suffered, and a defendant would lack this sort of knowledge, with possible exceptions (not applicable here) such as for the defendant who occupied a fiduciary duty or position of financial trust for the plaintiff. Even if the Court ordered a continuance and permitted even more time for Plaintiffs to conduct the discovery that they are now seeking, the Court doubts that Plaintiffs could obtain evidence, otherwise presently unavailable, to prove their own financial harm. In fact, with respect to Rosenberg, much of what Plaintiffs seek (e.g., whether someone would or would not have hired Rosenberg based on political position or whether someone would have voted for Rosenberg) is pure speculation. Moreover, with respect to Gural, much of what is sought (e.g., whether an engineering firm would have contributed to Gural's Palmyra mayoral election campaign) is not material to Gural's claims of an injury because Gural won the 2004 Palmyra mayoral election.

For all these reasons, the Court finds the present summary judgment motions are not premature and that Plaintiffs have not shown good cause to postpone their adjudication under Rule 56(f).

**2. Plaintiffs' Failure to File a Statement of Material Facts under Local Civil Rule 56.1**[FN15]

> FN15. L. Civ. R. 56.1 states that "on a motion for summary judgment, each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

issue."

**\*9** Defendants argue that, because Plaintiffs have failed to submit a Statement of Material Facts pursuant to L. Civ. R. 56.1., all facts in the opposing party's Statement of Material Facts are deemed admitted. *See Hill v. Algor,* 85 F.Supp.2d 391, 408 n. 26 (D.N .J.2001). Although Plaintiffs' opposition brief does contain a statement of facts (titled "Facts" in its opposition brief), Plaintiffs failed to submit a separate statement specifically identifying the disputed and undisputed material facts as required by L. Civ. R. 56.1.

A moving party's failure to comply with Rule 56.1 is itself sufficient to deny its motion. *See Bowers v. NCAA,* 9 F.Supp.2d 460, 476 (D.N.J.1998). In the alternative, "facts submitted in the statement of material facts, which remain uncontested by the opposing party are deemed admitted." *Hill,* 85 F.Supp.2d at 408 n. 26; *see also Montville Twp. v. Woodmont Builders,* 2005 U.S. Dist. LEXIS 18079 (D.N.J. Aug. 12, 2005)(where plaintiff did not file Rule 56.1 statement, "the Court will accept as true [defendant's] uncontested statements of fact for the purpose of the ruling.")[FN16] Other courts in this District have held that, where the non-moving party had not submitted a Rule 56.1 statement, the court treated facts in the moving party's Rule 56.1 statement as admitted "unless controverted in [the non-moving party's] briefs or contradicted by the evidence," *Longoria v. New Jersey,* 168 F.Supp.2d 308, 312 n. 1 (D.N.J.2001), or when such facts are "backed up by evidence." *Maertin v. Armstrong World Indus., Inc.,* 2000 WL 554168, \*1 (D.N.J. May 3, 2000).

> FN16. Instead, the court can choose to "admonish that the parties consult the local rules in future cases." *Comose v. New Jersey Transit Rail Operations, Inc.,* 2000 U.S. Dist. LEXIS 20790 (D.N.J.2000); *see also Leme v. International Total Serve.,* 56 F.Supp.2d 472, 477 n. 4 (D.N.J.1999).

Having found no evidence of bad faith on the part of Plaintiffs, the Court will not suppress Plaintiff's opposition on these procedural grounds but instead will now address the merits of the case and Defendants' motions,

albeit unaided by any Rule 56.1 response by Plaintiffs. However, all facts contained in Defendants' Rule 56.1 statement will be admitted if (1) supported by evidence and (2) not contradicted in Plaintiffs' opposing evidence.

**3. Whether Plaintiff Gural's Claims against Defendants Norcross and Gallagher are Barred by the New Jersey Entire Controversy Doctrine**[FN17]

> FN17. As explained *supra,* Plaintiffs conceded at oral argument that Plaintiff Gural has no remaining claims against Defendants JCA Associates, Chudzinkski and Neisser.

Defendants contend that all of Gural's claims against Defendants Norcross and R. Louis Gallagher, II should be dismissed as barred by the New Jersey Entire Controversy Doctrine ("NJECD"). (Def.'s Br. at 8-12.) These claims should be barred because, in June of 2001, Plaintiff Gural filed suit against Neisser, Chudinski and JCA in New Jersey Superior Court under the New Jersey CEPA alleging that Neisser and Chudinski took certain actions in retaliation against Gural. (Def.'s Br. at GN-1, Complaint, *Gural v. JCA,* BUR-L-001949-01.) According to Defendants, Gural was required to bring both the federal RICO claim and the other state law claims he now brings against Defendants Norcross and Gallagher in the 2001 CEPA action. Defendants state that Gural's federal RICO claim and state law claims arose from the same facts and circumstances that Gural's CEPA claim arose from and the NJECD requires that a party bring all claims arising from the same facts and circumstances in one single action. (*Id.*) Gural argues that the NJECD is inapplicable here because (1) Gural's RICO claim and other state law claims had not accrued at the time of the June 2001 state court action ("various damages that Gural has sustained since leaving JCA" have continued and the "events since settlement of Gural's CEPA Complaint have lead him to his [sic] courthouse") and (2) that Gural could not have brought a claim against Norcross and Gallagher because the earlier claims were brought under CEPA, which allowed Gural only to bring claims against his employer. (*Id.*)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

**\*10** The NJECD requires that all claims arising out of a single or series of transaction be brought against all potential parties in a single action. *See* Bartkus, *N.J. Federal Civil Procedure* ¶ 1-5:6 at 24; *see also Melikian v. Corradeti,* 791 F.2d 274, 279 (3d Cir.1986). The doctrine "also may preclude subsequent litigation against a party that could or should have been brought into the litigation but was not." FN18 Bartkus, *N.J. Federal Civil Procedure* ¶ 19-3.7 at 482 (citing N.J.R. 4:28, 4:29 and 4:30A); *see also* Pressler, *Current N.J. Court Rules,* Comments 1419-40 (Gann 2006 ed.) The NJECD also applies to situations involving a former settlement where the same purposes of the doctrine would be served by precluding claims, *see Shoremount v. APS Corp.,* 368 N.J.Super. 252, 255-56 (App.Div.2004), and where another plaintiff had separately sued similar defendants and settled. *See Prevratil v. Mohr,* 145 N.J. 180 (1996). The NJECD, however, does not bar a party from raising claims that he or she could not have brought in the initial action. *See Jones v. Holvey,* 29 F.3d 828, 831 (3d Cir.1994). Rather, under New Jersey law, a court "must be mindful that ... the party whose claim is being sought to be barred must have had a fair and reasonable opportunity to have fully litigated that claim in the original action." *See Ditrolio v. Antiles,* 142 N.J. 253, 273-74 (1995)(internal quotations omitted).

> FN18. The NJECD is applicable in federal courts in New Jersey and has been used to preclude actions brought in federal court that have already been litigated in state court. *See Sutton v. Sutton,* 71 F.Supp.2d 383, 389 (D.N.J.1999); *see also Okpor v. Rutgers, the State University of New Jersey,* 2005 WL 2044921, at *6-8 (D.N.J.2005).

Gural's cause of action against Norcross and Gallagher falls into the category of a claim that could not have been brought at the time Gural brought his 2001 CEPA claim against JCA Associates, Neisser and Chudzinksi. CEPA is a New Jersey state law that provides the exclusive remedy against a claimant's employer for retaliatory actions against the employee. *See* N.J.S.A. 34:19-3; *Abbamont v. Piscataway Twp. Bd. of Educ.,* 138 N.J. 405, 417-18 (1994). Because neither Norcross and Gallagher were employers of Gural, he could not have brought the RICO and state law claims currently asserted against Norcross and Gallagher (whether or not the claims had accrued at the time). *See Kounelis v. Sherrer,* 396 F.Supp.2d 525, 532 (D.N.J.2005)("CEPA is only applicable when there is a legitimate employee-employer relationship between the parties.") As such, Gural's claims against Norcross and Gallagher may proceed.

**C. Plaintiffs' RICO Claims**

In the FAC, both Plaintiffs bring a number of claims under RICO, 18 U.S.C. § 1962 *et seq.* Specifically, Plaintiffs allege:

- extortion in violation of RICO, 18 U.S.C. § 1962(b), (Counts II and X);

- bribery in violation of RICO, 18 U.S.C. § 1962(b) (Counts III and XI);

- participation in a RICO enterprise, 18 U.S.C. § 1962(c) (Counts IV and Count XII); and

- conspiracy in violation of RICO, 18 U.S.C. § 1962(d) (Counts V and Count XIII).

Although the precise requirements for establishing a civil RICO cause of action depend on the subsections of the statute a plaintiff invokes, there are four basic elements that a plaintiff must show to prove any civil RICO action: (1) the existence of a RICO enterprise; (2) the existence of a pattern of racketeering activity; (3) a nexus between the defendant, the pattern of racketeering activity or the RICO enterprise; and (4) resulting injury to the plaintiff's business or property. *See Blizzard v. Exel Logistics N. Am., Inc.,* 2005 U.S. Dist. LEXIS 28160 (D.N.J.2005); *see also Klapper v. Commonwealth Realty Trust,* 657 F.Supp. 948, 953 (D.Del.1987.)

**1. Plaintiffs have Failed to Demonstrate Harm to their Business or Property**

**\*11** According to Defendants, this Court need not con-

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

sider Plaintiffs' substantive requirements of RICO in this case because Plaintiffs have failed to demonstrate that either Plaintiff has suffered a harm to his respective business or property. (Def.'s Rosenberg Br. at 34 .) Plaintiffs counter by arguing that, because discovery is not completed, "Plaintiffs submit that this Court should not dismiss Plaintiffs' claims based on standing or lack of concrete property loss." (Pl.'s Opp. Br. at 19.) To this end, Plaintiffs continue to rely on the averments made in its FAC. (*Id.*) Plaintiffs reiterate that Gural was constructively discharged from his job at JCA and that both he and Rosenberg have been denied business opportunities and have lost increased business as a result of Defendants' racketeering. (*Id.* at 20-21.)

The issue of whether Plaintiffs can prove a concrete financial loss is a threshold issue that Plaintiffs' RICO claims cannot get beyond. The Supreme Court has held that a plaintiff "only has standing [to assert a RICO claim] if, and can only recover to the extent that, he has been injured in his business or property by conduct constituting the [RICO] violation." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985); *see also* 18 U.S.C. § 1964(c); *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786 (3d Cir.1984).[FN19] Thus, a plaintiff can establish standing by (1) showing that he suffered an injury to his business or property by demonstrating a concrete financial loss (rather than merely injury to a valuable intangible property interest); and (2) demonstrating that his injury was proximately caused by the defendant's RICO violation. *See Maio v. Aetna, Inc.,* 221 F.3d 472, 482-83 (3d Cir.2000)(quoting *Steele v. Hospital Corp. of Am.,* 36 F.3d 69, 70 (9th Cir.1994); *see also Eli Lilly & Co. v. Roussel Corp.,* 23 F.Supp.2d 460, 483 (D.N.J.1998)("a RICO plaintiff can only recover if he has been injured in his business or property....")[FN20] As the parties opposing summary judgment on this ground, Plaintiffs have the burden of producing admissible evidence from which a reasonable jury could find that Plaintiffs suffered a concrete financial loss proximately caused by Defendants' RICO violations. Plaintiffs have failed to meet this standard for a number of reasons.

FN19. 18 U.S.C. § 1964(c) provides:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee, ...

FN20. *See also Murphy v. Bancroft Constr. Co.,* 2002 WL 31641641, *3 (D.Del., Nov. 15, 2002) *aff'd* 135 Fed Appx. 515 (3d Cir. May 5, 2005) ("[I]t is well settled law that in any RICO case, injuries to business or property are not actionable unless they result in tangible financial loss to the plaintiff.")

First, despite the fact that discovery was ongoing for more than two years and that the parties have had numerous status conferences with Magistrate Judge Donio, Plaintiffs offer little in the way of material facts in dispute and have presented no evidence of a concrete financial loss due to Defendants' actions. Instead, Plaintiffs' brief offers excuses, promises, generalities and rhetorical questions. (Pl.'s Opp. Br. at 20-25.) For example, Plaintiffs state that "anecdotal evidence abounds to support Plaintiffs' claims" (*id.* at 21) and "[t]hese inchoate facts, coupled with the pleadings and proposed expert opinion" (*id.* at 24) support Plaintiffs' arguments.[FN21] Such an utter lack of evidence fails to raise a genuine issue of material fact. Under Fed.R.Civ.P. 56(e), the non-moving party in a motion to dismiss "*may not* rest upon the mere allegations" in its pleading in order to show the existence of a genuine issue. Fed.R.Civ.P. 56(e)(emphasis added). This is the situation here as Plaintiffs have failed to present any evidence outside of anecdotes and the averments made in the FAC and thus, have failed to raise a genuine issue of material fact.

FN21. Rosenberg does, however, outline his legal expenses as a concrete financial loss.

*12 Second, the Court is doubtful that Rosenberg, even with additional time to conduct the discovery he is seeking in his Rule 56(f) motion, could present evidence of a concrete financial loss to raise a genuine issue. Rosen-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

berg's claims of lost work due to the absence of expected political patronage jobs are not the type of "concrete financial losses" that the RICO Act will recognize. For example, Rosenberg alleges that he lost political appointments in Edgewater Park and Burlington Township, and was unsuccessful in obtaining future political appointments due to Defendants' actions. (Rosenberg Dep. Tr. at 111, 151.) It is clear that under the Third Circuit's decision in *Maio*, Rosenberg has failed to give evidence in support of a cause of action that is recoverable under RICO for economic harm. *See Maio*, 221 F.3d at 494-95 ("the present economic harm [plaintiffs] allege to have suffered necessarily is contingent upon the impact of events in the future which have not yet occurred.") Finally, Plaintiffs have failed to persuade this Court to recognize (or point to any case law where any other Court has recognized) a state law right to a "political future" or for loss of "community standing," that is somehow to be preserved for those who choose to enter upon political careers. (*Id.* at 37-40.)

Third, the evidence Defendants have presented with their motion shows that, rather than having their businesses and political careers harmed since Defendants' alleged actions in 2001 and 2002, Plaintiffs' careers and businesses have improved. Specifically, with respect to Rosenberg, the Court notes that (1) Rosenberg was reappointed as the solicitor of Palmyra on February 10, 2001 (and therefore lost no income from Defendants' alleged attempts to fire him) and (2) based on his tax returns, has increased income from his law practice from 1999 to 2000 and 2000 to 2001. (Rosenberg Dep. Tr. at 163-164, 203-04.) In addition, Rosenberg has presented no evidence of a loss of clients as a result of Defendants' actions as he could not "say definitively" whether he lost *any* business due to Defendants' actions. (Rosenberg Dep. Tr. at 162.) With respect to Gural, the Court notes that his annual earnings have increased between 2001 and 2002 (since he left JCA Associates) from an annual salary of $45,000 to a salary of $60,000. (Gural Dep. Tr. at 75-76.) Moreover, Gural has not suffered any concrete financial loss in relation to his political career. (*Id.*) Instead, Gural's political career has thrived, as he was elected to a higher office (he now serves as the mayor of Palmyra) in 2004 than he held in

2000 (when he served as a Palmyra Borough councilman)). (*Id.*)

**2. Defendants are Entitled to Summary Judgment as to Plaintiffs' Federal RICO Claims**

Plaintiffs have failed to point out, either in their pleadings, brief in opposition to Defendants' motions, or any certifications or affidavits accompany their opposition, any tangible financial loss or that a genuine issue of material fact as to Plaintiffs' losses exist. Metaphysical concepts of financial loss do not satisfy this standard. As such, the Court will grant Defendants' motion for summary judgment as to the four Federal RICO claims Rosenberg brought against all Defendants (Counts II-V)and the four Federal RICO claims Gural brought against Norcross and Gallagher (Counts X-XIII).[FN22]

> FN22. The Court, in finding that Plaintiffs are unable to demonstrate concrete financial harm to businesses or property under RICO, does not consider whether Plaintiffs have demonstrated that the Defendants committed racketeering acts as alleged under RICO. Even if such evidence of Defendants' criminal conduct exists, Plaintiffs cannot recover under RICO for the sort of harm they have allegedly suffered, which is the only holding of this Court under RICO.

**D. *Remaining State Law Claims Brought by Both Plaintiffs***

**\*13** In addition to claims under the Federal RICO Act, Plaintiffs bring state law claims for a violation of the New Jersey RICO statute, tortious interference with contract and business relationships, and civil conspiracy. Defendants first argue that the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims if the Court dismisses Plaintiffs' Federal RICO claims. Under 28 U.S.C. § 1367(c), once a district court has dismissed all claims over which it has original jurisdiction, the district court has discretion to retain jurisdiction over any pendent state law claims. *See Pennsylvania Nurses Ass'n v. Pennsylvania State*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

*Educ. Ass'n.*, 90 F.3d 797, 801 (3d Cir.1996); *see also Erich v. B.A.T. Indus., P.L.C.*, 964 F.Supp. 164, 167 (D.N.J.1997). In doing so, the Court must "consider generally accepted principles of judicial economy, convenience, and fairness to litigants." *United Mine Workers v. Gibbs*, 388 U.S. 715, 726 (1966).

This case has been pending in this Court for over three years and the parties have conducted over two years worth of discovery. At this point in the litigation, it is in the interest of judicial economy and fairness to the litigants that this Court retain jurisdiction over the remaining state court claims for the following reasons. Both the District Judge and the Magistrate Judge are familiar with the parties' claims and the facts of this case. Second, retaining jurisdiction over this matter would likely lead to a quicker resolution of the matter than if this Court dismissed the remaining claims for lack of Federal jurisdiction and the Plaintiffs were required to restart the action in state court. Finally, retaining jurisdiction would not prejudice the parties with respect to their state law claims as this court is well-versed in interpreting aspects of New Jersey state law.

Turning to the merits of Defendants' arguments, this Court holds that summary judgment is appropriate in favor of Defendants with respect to Plaintiffs' New Jersey RICO, tortious interference and civil conspiracy claims.

**1. New Jersey RICO**

Defendants argue that Plaintiffs' New Jersey RICO Act claim should be dismissed because, like the federal RICO claim, Plaintiffs are unable to (i) show a causal link between Defendants' activities and the harm (if any) suffered by Plaintiffs and (ii) demonstrate a "pattern of racketeering activity." (Def.'s Br. at 64 (Rosenberg).)

The New Jersey RICO Act has been interpreted by borrowing from federal RICO precedents. *See Barr Labs., Inc. v. Bolar Pharm. Co ., 1992 U.S. Dist. LEXIS 22883, *29-30 (D.N.J.1992) ("the case law interpreting the federal RICO statute may be used to interpret New Jersey's RICO statute"); *Kievit v. Rokeach*, 1987 U.S.

Dist. LEXIS 16131, *20-21 (D.N.J.1987)("The virtual identity of the federal and New Jersey RICO acts permits the Court to interpret them in a consistent manner.") Indeed, the New Jersey courts have held similarly, stating that the use of federal case law "would be especially appropriate in this matter in that the New Jersey RICO statute 'borrows' its structure, purpose and remedies from federal RICO." *In re Liquidation of Integrity Ins. Co.*, 245 N.J.Super. 133, 135 (Law Div.1990). Moreover, the New Jersey RICO Act provides no more expansive definition of harm to business or property than the Federal RICO Act. *See* N.J. Stat. Ann. 2C:41-2; 18 U.S.C. § 1964(c).

*14 As discussed in Section III.C, *supra*, this Court finds that Plaintiffs have failed to provide any evidence that they have suffered any concrete financial loss of the type cognizable under New Jersey RICO. As such, Plaintiffs have failed to raise genuine issues of material fact related to these issues.

**2. Tortious Interference with Business Relations**

Defendants contend that Plaintiffs' tortious interference claims are also without merit. Under New Jersey law in order to bring a claim of tortious interference with business relations, a plaintiff must show that: (1) plaintiff had a continuing or prospective economic relationship or reasonable expectation of economic advantage, (2) defendant knew of the contract or relationship of expectance, (3) the interference was done intentionally or without justification or excuse, (4) it is reasonably probable that plaintiff's loss was a result of defendant's interference and (5) damages resulted from the interference. *See Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285, 305-06 (2001); *Baldasarre v. Butler*, 132 N.J. 278, 293 (1993); *Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 493 (D.N.J.1998). Defendants argue that Plaintiffs had no reasonable expectation of prospective business relationships as the expectation was in the form of political patronage positions that would flow from either a prominent position in a political party (in the case of Rosenberg) or as an employee or elected official (in the case of Gural).[FN23]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

FN23. Plaintiffs do not offer direct opposition in their papers but instead argues only that, because Plaintiff "has only been afforded the most limited of discovery," summary judgment should be denied. (Pl.'s Opp. Br. at 45.)

The central issue here is that, under New Jersey law, Rosenberg and Gural must show that they had a "reasonable expectation of economic advantage that was lost as a direct result" of a Defendants' actions. *Lamorte,* 167 N.J. at 306. "[A] plaintiff asserting a tortious interference claim must allege facts that show an existing or prospective economic ... relationship ...'[a] mere allegation of lost business does not suffice." *Eli Lilly & Co.,* 23 F.Supp.2d at 494 (quoting *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.,* 801 F.Supp. 1450, 1459 (E.D.Pa.1992)). The Court finds that neither Rosenberg nor Gural can maintain a cause of action for tortious interference with prospective business relationships as the expectation was in the form of political patronage positions. However, the Court finds that Gural can maintain a cause of action for tortious interference with respect to his engineering job at JCA Associates and that summary judgment in favor of Defendants Norcross and Gallagher would be inappropriate.

**a. Political Patronage Positions**

Here, Plaintiff Rosenberg has not presented any evidence that he had a reasonable expectation of economic advantage that would come from winning the 2000 BCDC chairmanship, an opportunity that Defendants allegedly blocked. For example, Rosenberg bases his argument that he had a "reasonable expectation of economic advantage" on the fact that political patronage jobs would have flowed to him had he won the chairmanship election. Aside from the unsupported certification of Plaintiffs' proposed expert on New Jersey politics and corruption (Carl Mayer, Esq.), Rosenberg has presented no evidence that such a windfall of patronage jobs was a "reasonable expectation."[FN24] (Certification of Carl Mayer, Pl .'s Opp. Br. at Ex. C.) Mr. Mayer's certification alone does not, in the eyes of this Court, create a triable fact on whether such patronage jobs were a "reasonable expectation." Without an

affidavit or certification from Rosenberg of a third party stating that, but for Rosenberg's loss in the 2000 election he would have likely received an appointment as a township or municipal attorney, for example, this Court cannot find that there is a triable issue of material fact as to Rosenberg's reasonable expectation.

FN24. In his certification, Mayer states that it is his opinion that "County political chairmen who are attorneys utilize the Chairman's position as a source of legal business" (Mayer Cert. ¶ 8) and that actions of Defendants "had a direct effect on Rosenberg's ability to receive additional political appointments in mainstream Democratic communities," (*Id.* ¶ 10), and that he believed "Rosenberg's failure to secure additional paid/legal positions was directly attributable to the criminal attempts by Norcross ... [but that he] cannot with any certainty give opinions regarding this particular matter at this time without further facts." The Court notes that Mayer has failed to point the Court to any underlying facts supporting his conclusions. In fact, Mayer states that he "advised ... Plaintiffs to depose numerous county chairmen who are attorneys to inquire whether these individuals have obtained substantial business through elections to Chairman." (*Id.* ¶ 9.) Without facts to support Mayer's conclusions, this Court finds that this opinion does not raise any material issue of fact. Such an opinion is not anchored in the facts of this case and would therefore be inadmissible under Rule 702, Fed. R. Ev., and thus it cannot form a basis for opposing summary judgment under Rule 56(e), *supra.*

**\*15** Moreover, the Court recognizes that the process of awarding political patronage jobs in the rough-and-tumble world of New Jersey politics can be a process tinged with political alliance and cronyism. Such activities are performed purely in the political arena, absent breach of statutory or constitutional right. This Court is not the arena for determining whether political alliances and maneuverings are fair or proper as among

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

participants. Likewise, the Court is unable to recognize that one who secures political office has a "reasonable expectation" of securing private business relationships based on holding a political position or elected office. Trading upon political office for private financial gain is not a protectable expectation, even if, unlike the present case, such a gain could be monetized.

In addition, the notion that more discovery is necessary for Rosenberg to properly respond to Defendants' arguments in support of summary judgment on this claim also falls flat as discussed in Part III.A, *supra*. Plaintiffs main issue is that they did not have an opportunity to depose Defendants. Plaintiffs certainly had the ability to present evidence in the form of their own testimony or affidavits or certification from third parties that Rosenberg had a reasonable expectation of receiving legal work as a result of political patronage upon taking the position of BCDC chairman. The Court does not see how the inability to depose Defendants impacts Plaintiffs' ability to prove a reasonable expectation of economic advantage from such patronage. As such, the Court will grant Defendants' motion for summary judgment (as to Rosenberg) with respect to his tortious interference claims.

**b. Gural's Employment at JCA Associates**

Gural's claim of tortious interference with business relationships with respect to his employment at JCA Associates is a different matter. In Count IX of the FAC, Gural alleges that: (1) he was an employee of JCA Associates; (2) Norcross and Gallagher knew of Gural's relationship with JCA Associates; and (3) Norcross and Gallagher intentionally interfered with Gural's business relationship with JCA Associates causing Gural's "constructive discharge." (FAC ¶¶ 186-88.)

Here, Gural has properly alleged a claim for tortious interference with contract or business relationship as the FAC contains allegations relating to all five elements of a tortious interference claim. *See Lamorte*, 167 N.J. at 305-06. As an employee of JCA Associates, Gural certainly had a continuing economic relationship with JCA Associates and Gural was damaged when he was ter-

minated (having to endure the loss of employment and claiming that he was unable to find employment in South Jersey as a project manager). (FAC ¶ 202.) Defendants, however, have failed to present evidence demonstrating that no genuine issue of material fact exists regarding Norcross and Gallagher's knowledge of Gural's employment, their role in Gural's discharge or whether it was reasonably probable that Gural's loss was a result of the interference of Norcross and Gallagher into the operations of JCA Associates. The moving party bears the initial burden of showing that no genuine issue of material fact exists on these three elements of a tortious interference claim, regardless of the fact that Gural will ultimately bear the burden of persuasion at trial. *See Celotex Corp.*, 477 U.S. at 323. Here, Defendants Norcross and Gallagher have failed to satisfy this burden, and their motion for summary judgment as to Gural's claim of tortious interference with his employment will be denied.[FN25]

> FN25. The parties shall conclude discovery on the sole remaining claim in this matter (Count IX of the FAC) within forty-five days of the date of this Opinion and Order. This shall include the taking of any and all remaining depositions.

**3. Civil Conspiracy Claims**

*16 Third, Defendants argue that Plaintiffs' civil conspiracy claims are without merit. (Def.'s Rosenberg Br. at 65.) Under New Jersey law, a civil conspiracy is:

> [A] combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.

*Banco Popular North America v. Gandi*, 184 N.J. 177-78 (N.J.2005); *see also Eli Lilly & Co.*, 23 F.Supp.2d at 496. Because an action for civil conspiracy is a tort action, a plaintiff must point to "consequential damage to the rights of another, of which the overt act

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
(Cite as: 2007 WL 1038893 (D.N.J.))

is the proximate cause." *Eli Lilly & Co.,* 23 F.Supp.2d at 496-97 (citing *Board of Educ. of the City of Asbury Park v. Hoek,* 66 N.J.Super. 231, 241 (App.Div.1961)).

Defendants contend, there was no wrongful act or attempted wrongful act, nor was there any agreement between the Defendants and Gural to remove Rosenberg (nor was Rosenberg even removed from his position). (Def.'s Rosenberg Br. at 65.) The real issue here, however, is that Plaintiffs have failed to raise a material issue of fact that they have suffered any harm as a result of any actions of Defendants. With respect to Gural, the only evidence Plaintiffs put forth regarding harm that Gural suffered are set forth in Gural's certification. (Certification of John J. Gural, Pl.'s Opp. Br. at Ex. A.) However, as Defendants' counsel argued at oral argument, Gural's

certification fails to allege harms against him personally. Rather, Gural alleges harms against the town of Palmyra (in the form of grants from the New Jersey Department of Transportation being held back, (*see* Gural Cert. ¶ 7)), his political campaigns (*see id.* ¶ 5), his political allies (Robert Stewart was allegedly fired as the auditor of the Township of Magnolia as retribution ( *see id.* ¶ 8)) and that he was not invited to various political events and fund raisers and his political career was harmed (*see id.* ¶¶ 9-10, 16-18.) Nowhere in Gural's certification does he present evidence that either his business, reputation or person were harmed by Defendants' actions. Moreover, as mentioned in Section III.D.2 *infra,* the certification of Carl Mayer, on behalf of Rosenberg, also fails to present a genuine issue of material fact as to an tangible harm suffered by Rosenberg on account of Defendants' alleged civil conspiracy.

**4. Gural's Claims for Intentional Infliction of Emotional Distress.**

In the FAC, Gural brings a claim of intentional infliction of emotional distress due to Defendants' "extreme and outrageous" actions of Defendants wherein Gural "suffered emotional distress." (FAC ¶ 261-62.) In their motion, Defendants argue that Gural cannot maintain a cause of action for intentional infliction of emotional

distress because Gural has presented no evidence that the distress suffered was severe, that he "sought psychiatric treatment or had a condition that required medication." (Def.'s Br. at 24.)

*17 In New Jersey, a plaintiff states a claim for intentional infliction of emotional distress if he alleges: (1) that the defendant acted intentionally or recklessly; (2) that the defendant's conduct was extreme and outrageous; (3) the defendant's action was the proximate cause of the plaintiff's emotional distress; and (4) that the plaintiff's distress was so severe that no reasonable person would be expected to endure it. *See Buckley v. Trenton Sav. Fund Society,* 111 N.J. 355, 369 (1988). With respect to whether a plaintiff's distress is so severe that no reasonable person would be expected to endure it, New Jersey courts have stated that mental distress such as "aggravation, embarrassment, an unspecified number of headaches, and the loss of sleep" is insufficient to sustain claim of intentional infliction of emotional distress. *Id.* at 368. At the summary judgment stage, a plaintiff must provide the court with evidence of a severe emotional distress; without such evidence of "interference with day-to-day activities" or an indication of "a need for psychiatric counseling," summary judgment must be granted in favor of the defendant. *Harris v. Middlesex County College,* 353 N.J.Super. 31, 47 (App.Div.2002)(citing *Shelcusky v. Garjulio,* 172 N.J. 185 (2002)).

Here, Gural has presented no evidence of any emotional distress let alone severe emotional distress. Even Gural's certification submitted with Plaintiffs' brief in opposition to Defendants' motion for summary judgment was devoid of any mention of any distress he has suffered. Thus, Gural has failed to raise a genuine issue of material fact. As such, this Court will grant Defendants' motion as to Gural's claim of intentional infliction of emotional distress.

**5. Eleanor Gural's Claims for Loss of Consortium**

Finally, the Court addresses Defendants' argument that summary judgment is appropriate because Eleanor Gural cannot maintain her claim for loss of consortium

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

(Count XVIII). (FAC ¶¶ 266-67.) Defendants argue that because Eleanor Gural cannot recover damages for loss of consortium because John Gural's injuries (if any) are economic and not physical.

Defendants are correct and summary judgment should be granted with respect to Eleanor Gural's loss of consortium claim. It is well settled that "[d]amages for loss of consortium are derivative, and arise only where there is direct physical injury to the other spouse." *Oliver v. Raymark Indus., Inc.*, 799 F.2d 95 (3d Cir.1986) (citing *Rex v. Hutner*, 26 N.J. 489, 492 (1958) and *Cappiello v. Ragen Precision Indus., Inc.*, 192 N.J.Super. 523, 532 (1984)); *see also* W. Prosser, et al. *The Law of Torts* § 125 (5th ed.1984). As this Court discussed in Section III.D.4, *supra*, John Gural has failed to provide any evidence of a physical injury or that he suffers any psychiatric disorder or emotional distress as a result of the Defendants' alleged actions. Because John Gural has failed to demonstrate any physical injury, under New Jersey law, Eleanor Gural's claim for loss of consortium necessarily fails.

## IV. *DEFENDANTS' MOTION FOR ATTORNEY'S FEES AND SANCTION*

**\*18** All Defendants also move for attorney's fees and sanctions pursuant to Fed.R.Civ.P. 11. Defendants assert that Plaintiff Gural's counsel violated Rule 11 by attempting to re-litigate the same facts alleged in Gural's complaint for relief under New Jersey's Conscientious Employee Protection Act. Defendants also argue that Plaintiff Rosenberg violated Rule 11 by instituting this litigation after it became clear that the State of New Jersey would not issue any indictments stemming from the surrounding facts.

Rule 11, Fed.R.Civ.P.,[FN26] "imposes on counsel a duty to look before leaping and may be seen as a litigation version of the familiar railroad crossing admonition to 'stop, look, and listen.' " *Lieb v. Topstone Indus.*, 788 F.2d 151, 157 (3d Cir.1986); *Brunner v. Allied Signal, Inc.*, 198 F.R.D. 612, 616 (D.N.J.2001). In other words, Rule 11 requires that an attorney who submits a complaint certify that it is not asserted for improper pur-

poses, such as delay or harassment, and that there is a reasonable basis in fact and law for the claims made. *See Carlino v. Gloucester City High Sch.*, 57 F.Supp.2d 1, 37 (D.N.J.1999) (citing *Napier v. Thirty or More Unidentified Federal Agents, etc.*, 855 F.2d 1080, 1090 (3d Cir.1988)). Rule 11 is intended to discourage the filing of frivolous, unsupported, or unreasonable claims. *See id.*

FN26. Rule 11 provides, in relevant part:

**(b) Representations to Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... [that]

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; ...

**(c) Sanctions.** If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for their violation.

(1) ...

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

(A) By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion ... the challenged ... claim ... is not withdrawn or appropriately corrected ....

The Third Circuit has written that "[t]he legal standard to be applied when evaluating conduct allegedly violative of Rule 11 is reasonableness under the circumstances." *Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 289 (3d Cir.) (citations omitted); *Carlino*, 57 F.Supp.2d at 37. Reasonableness in the context of a Rule 11 inquiry has been defined as "an objective knowledge or belief at the time of the filing of a challenged paper that the claim was well grounded in law and fact." *Id.*; *Clement v. Public Serv. Elec. & Gas Co.*, 198 F.R.D. 634, 637 (D.N.J.2001). Bad faith is not required for a Rule 11 violation, *see Clement*, 198 F.R.D. at 637 (citing *Martin v. Brown*, 63 F.3d 1252, 1264 (3d Cir.1995)), and thus there can be no 'empty head, pure heart' justification for the filing of frivolous claims. *See Clement*, 198 F.R.D. at 637 (quoting Fed.R.Civ.P. 11, adv. cmte. notes (1993)).

Defendants served the instant Rule 11 motion upon Plaintiffs on December 1, 2005, and filed the motion with the Court more than 21 days later, on December 22, 2005. Plaintiffs did not withdraw the challenged claims against Defendants during the "safe harbor" period. As discussed in footnote 10, in Section II, *supra*, Plaintiffs, however, did concede at oral argument that Plaintiff Gural's claim against Defendants JCA Associates, Chudzinski and Neisser must be dismissed as barred by New Jersey's Entire Controversy Doctrine ("NJECD").

#### A. *Rule 11 Motion Against Plaintiff Gural's Counsel*

As discussed in Section III.B.3, *supra*, Defendants argue that Gural's claims are barred by the NJECD be-

cause he brought these same claims in a state court action under New Jersey's Conscientious Employee Protection Act in 2001. According to Defendants, because Gural's claims are barred by the NJECD, Gural's counsel is subject to sanctions under Fed.R.Civ.P. 11 because Gural's claims are not "warranted by existing law" as Rule 11 requires. *See Reynolds v.. U.S. Capitol Police Bd.*, 357 F.Supp.2d 19 (D.D.C.2004). According to Defendants, Gural's counsel was not only aware of Gural's prior state court litigation but had direct access to the state court complaint and essentially copied the state court complaint verbatim and merely refashioned Gural's claims for purposes of bringing this federal RICO claim.

**\*19** Defendants have failed to show why sanctions are appropriate in this case. While Plaintiff Gural's RICO claims against Norcross and Gallagher did not survive summary judgment, they were not doomed from the start or not "warranted by existing law" because of the NJECD as Defendants argue. Indeed, this Court held *supra* that Gural's claims against Defendants Norcross and Gallagher were not barred by the NJECD. Specifically, this Court held *supra* that neither Norcross nor Gallagher qualified as Gural's "employer" under CEPA and therefore Gural could not have brought his 2001 action against them. *See* N.J. Stat. Ann. 34:19-2(a). Accordingly, under *Holvey*, the NJECD does not bar Gural's claim against Norcross and Gallagher because Gural could not have brought a CEPA action against these defendants in 2001. *Holvey*, 29 F.3d at 831. Thus, Defendants' motion for attorney's fees and sanctions against Gural's counsel will be denied.

#### B. *Rule 11 Motion Against Plaintiff Rosenberg*

Defendants also argue that this Court should sanction Plaintiff Rosenberg because Rosenberg filed this action for improper purposes in violation of Fed.R.Civ.P. 11(b)(1). In support of their position, Defendants argue that "Rosenberg testified that the reason he filed this lawsuit against [Defendant] Norcross was because it became clear to him that the State was not going to indict [Norcross]" and that, in explaining his decision to sue Norcross, Rosenberg failed to cite any reasons that had

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303
**(Cite as: 2007 WL 1038893 (D.N.J.))**

to do with Rosenberg having suffered concrete financial harm or loss of reputation due to the actions of Defendants. (Def.'s Br. for Sanctions at 8.)

Again, Defendants have failed to show that sanctions are appropriate in this case. This Court agrees with Defendants that Rosenberg's motivation for bringing this lawsuit is an important element in determining whether to award attorney's fees and sanctions. Indeed, Rule 11 states that a pleading must not be "presented for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Fed.R.Civ.P. 11(b)(1). However, this Court does not find the evidence Defendants present demonstrating Rosenberg's improper motive to be persuasive. Defendants argue that Rosenberg's deposition testimony-specifically his he statement that he decided to sue Norcross after it became clear that the State would not indict Norcross-as evidence of his improper motive. (Rosenberg Dep. Tr. at 73.) However, this Court views this testimony only as simply a statement pertaining to the time Rosenberg decided to bring this suit, not the motivation for bringing the suit. Simply because Rosenberg chose this time to file suit does not, without more, mean that he had an improper motive. Rosenberg's legal and factual assertions were not unreasonable, even though not meritorious in the end. Thus, there is no evidence to suggest that Rosenberg brought this action for improper purposes such as harassment or delay. As such, this Court will deny Defendants' motion for sanctions against Rosenberg.

## V. *CONCLUSION*

**\*20** For the reasons explained above, this Court will deny Plaintiffs' request for a continuance and for additional discovery under Rule 56(f) as Plaintiffs have failed to demonstrate how additional discovery (e.g., depositions of Defendants) would alter the outcome of Defendants' motions for summary judgment as to the issue of economic harm, or why Plaintiffs have failed to take advantage of the discovery process overseen by Judge Donio. As such, the Court finds that Defendants' motions for summary judgment are not premature and that this Court may now proceed with deciding these motions.

With respect to the merits of Defendants' motions for summary judgment, this Court will grant Defendants' motions for summary judgment with respect to Plaintiffs' Federal RICO claims (Counts II-V and X-XIII of the FAC) because neither Rosenberg or Gural have demonstrated that they have suffered any cognizable harm to their "business or property" as a Plaintiff is required to show under the Federal RICO laws these claims will be dismissed. In addition, because Plaintiffs have failed to present evidence raising a genuine issue of material fact related to (1) Plaintiffs' state law claims of New Jersey RICO (Counts VII and XV) and civil conspiracy claims (Counts VIII and XVII) and Rosenberg's tortious interference with contract and business relationships (Count I); (2) John Gural's claim of intentional infliction of emotional distress (Count XVI), and (3) Eleanor Gural's claim of loss of consortium (Count XVIII), the Court will also grant Defendants' motion for summary judgment with respect to these claims as well. As such, these claims shall be dismissed. The Court will deny the motion of Defendants Norcross and Gallagher for summary judgment as to Gural's tortious interference with contract and business relationships (Count IX) and this claim will proceed, and all discovery upon this claim shall conclude within forty-five days hereof.

Finally, the Court will deny Defendants' motions for attorneys fees and sanctions, as neither the actions of Plaintiff Gural's counsel nor Rosenberg violate Rule 11.

The accompanying Order is entered.

D.N.J.,2007.
Rosenberg v. JCA Associates, Inc.
Not Reported in F.Supp.2d, 2007 WL 1038893 (D.N.J.), RICO Bus.Disp.Guide 11,303

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2010 WL 1379712 (D.N.J.)
(Cite as: 2010 WL 1379712 (D.N.J.))

Page 1

Only the Westlaw citation is currently avail-
able.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
Morton SCHNEIDER, Plaintiff,
v.
TOWNSHIP OF TOMS RIVER (f/k/a Township of
Dover); Township of Toms River Police Depart-
ment(f/k/a Township of Dover Police Department);
Investigator Sandra Rodriguez, Dover Township
Police Officer Greg Errion, Dover Township Police
Officer Louis Santora, Dover Township Police Of-
ficer Paul Burkhardt, Bricktown Police Officer
Henry Drew (formerly an investigator with the
Ocean County Narcotics Strike Force), Ocean
County and John Does 1-20, Defendants.
Civil Action No. 09-3866 (GEB).

March 29, 2010.

Peter William Till, Law Offices of Peter W. Till,
Springfield, NJ, for Plaintiff.

Michael James Gilmore, Gilmore & Monahan, PA,
Mary Jane Lidaka, Berry, Sahradnik, Kotaz & Ben-
son, PC, Toms River, NJ, for Defendants.

**MEMORANDUM OPINION**

BROWN, Chief Judge.

*1 This matter comes before the Court upon the
motion for summary judgment filed by the defend-
ants County of Ocean and Sandra Rodriguez
("Defendants") (Doc. No. 6), as well as the motion
for continuance filed by the Plaintiff Morton
Schneider ("plaintiff" or "Schneider") (Doc. No.
13). Both motions are opposed. Oral arguments
were held on March 2, 2010. For the reasons that
follow, Defendants' motion for summary judgment
will be granted, and plaintiff's motion for continu-

ance will be denied.

**I. BACKGROUND**

This case arises from the alleged unconstitutional
conduct of the Dover police department. Plaintiff
alleges that his home was raided and robbed as a
result of an improperly and wrongfully issued war-
rant that resulted in plaintiff's arrest and indictment
for marijuana possession. (Am. Compl. at ¶¶ 7-9;
Doc. No. 2.) Plaintiff also claims that portions of
his land, including a well, were confiscated from
his property by the Township. (Id. at ¶¶ 14-18.)
Plaintiff alleges that there was

a custom, policy, pattern and practice in Ocean
County ... of condoning, encouraging, ratifying,
and acquiescing in the practice of failing to con-
duct reasonable criminal investigations, conduct-
ing unconstitutional searches, fabricating evid-
ence to support probable cause, committing per-
jury, coercing confessions and consent to
searches, failing to disclose exculpatory evidence
and covering up this unconstitutional misconduct.

(Id. at ¶ 78.) The marijuana possession charges
against Plaintiff were dismissed on May 6, 2008. (
Id. at ¶ 20.)

Subsequent to the state criminal action, plaintiff
filed a civil action on April 19, 2004, in the Superi-
or Court of New Jersey, Law Division, Ocean
County, against the Dover Township Police Depart-
ment alleging libel, slander, defamation and negli-
gence as well as violations of 42 U.S.C. § 1983.
(Def.'s 56.1 Stmt. ¶ 8; Doc. No. 6.) On May 19,
2004, Ocean County filed a motion to dismiss the
complaint in lieu of an answer, and on July 11,
2004, that motion was granted and plaintiff's com-
plaint was dismissed with prejudice. (Id. at ¶¶
11-12.)

After the dismissal of the state action, plaintiff filed
a complaint in federal court on August 4, 2009, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1379712 (D.N.J.)
**(Cite as: 2010 WL 1379712 (D.N.J.))**

an amended complaint on August 17, 2009, alleging the defendants committed: Malicious Prosecution in violation of the Fourth and Fourteenth Amendments (Count I); Fabrication of Evidence in violation of the Fourth and Fourteenth Amendments (Count II); Failure to Investigate in violation of the Fourth and Fourteenth Amendments (Count III); Suppression of Favorable Evidence in violation of the Fourth and Fourteenth Amendments (Count IV); Civil Rights Conspiracy under 42 U.S.C. § 1983 (Count V); Supervisory Liability (Count VI); A *Monell* Claim for Unconstitutional Custom or Policy and Failure to Supervise and Train (Count VII); and State Law Claims of Malicious Prosecution (Count VIII); and Intentional or Negligent Infliction of Emotional Distress (Count IX).

## II. DISCUSSION

**\*2** In lieu of an answer to the complaint, the defendants filed a motion for summary judgment (Doc. No. 6), arguing that: (1) plaintiff's complaint is barred by the doctrine of *res judicata;* (2) plaintiff's complaint is barred by the statute of limitations; (3) The Ocean County Prosecutor's Office and the narcotics strike force are not agents of the County; (4) plaintiff cannot establish a cause of action against the County of Ocean under 42 U.S.C. § 1983; (5) plaintiff cannot establish a deprivation of any constitutional or federal statutory rights; (6) plaintiff cannot establish the necessary elements of a civil conspiracy; (7) plaintiff cannot establish the elements necessary for malicious prosecution; and (8) that there are no genuine issues of material fact and the defendants are entitled to summary judgment.

In opposition to this motion for summary judgment, plaintiff filed a lengthy brief and a "Counter-Statement of Material Facts in Opposition." (Doc. No. 8.) This counter statement of material facts does not comply with L. CIV. R. 56.1(a) because it consists only of hearsay statements with no reference to the record. It is not accompanied by an affidavit or certification from plaintiff or anyone

on his behalf, though a certification was filed several months late, on the day after oral argument was held.

In response to this shortcoming, plaintiff then filed a motion for continuance pursuant to FED. R. CIV. P. 56(f). (Doc. No. 13.) Plaintiff seeks to defer this Court's ruling on the currently pending motion for summary judgment, as plaintiff seeks to conduct factual discovery. (Pl.'s Mot. at ¶ 4; Doc. No. 13.) There has been no factual discovery yet in this action. (*Id.* at ¶ 5.) Defendants oppose the motion for continuance, noting that plaintiff was able to file a brief in opposition to the motion for summary judgment, and did not file the motion for continuance with the opposition to the summary judgment motion, but rather after the issue was first raised by defendants in their reply brief. (Defs.' Opp. to Pl.'s Mot. for Continuance at 4; Doc. No. 15.)

### A. Standards of Review

#### 1. Rule 56(f) Standard

Rule 56(f) of the Federal Rules of Civil Procedure provides:

> If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) deny the motion;
>
> (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
>
> (3) issue any other just order.

FED. R. CIV. P. 56(f). A district court's decision to grant a Rule 56(f) motion "depends, in part, on 'what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.' " *Horvath v. Keystone Health Plan E,* Inc., 333 F.3d 450, 458 (3d Cir.2003) (quoting *Contractors Ass'n of E. Pa.,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1379712 (D.N.J.)
(Cite as: 2010 WL 1379712 (D.N.J.))

*Inc. v. City of Phila.*, 945 F.2d 1260, 1266 (3d Cir.1991)). However, because "[a] district court has discretion in acting on Rule 56(f) motions," this list of factors is not exhaustive. *Id.* Instead, it "simply offer[s] a guide for the district court to follow in exercising its discretion under Rule 56(f)." *Id.*

**2. Summary Judgment Standard**

*3 A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hersh v. Allen Prods. Co. Inc.*, 789 F.2d 230, 232 (3d Cir.1986). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir.1987).

**B. Analysis**

**1. Rule 56(f) Affidavit and Motion for Continuance**

Plaintiff seeks factual discovery regarding: (1) whether the Ocean County Prosecutor's Office or Narcotics Strike Force are the agents and/or employees of Ocean County; (2) whether any of the actions alleged in the complaint were taken in aid of a policy, statement, ordinance, regulation or de-

cision officially adopted or promulgated by Ocean County; and (3) facts related to the prosecution of the underlying criminal trial of plaintiff Morton Schneider. (Pl.'s Mot. for Continuance at ¶ 6; Doc. No. 13.)

Defendants argue that the motion for continuance should be denied because it was not made in a timely fashion. The plaintiff did make the argument that more discovery was needed in his opposition papers. (Pl.'s Opp. to Summ. J. at 44; Doc. No. 8.) However, an argument in a persuasive document is no substitute for the affidavit that is required by Rule 56(f). Defendants cite to *Walker v. Rose*, 22 F.Supp.2d 343 (D.N.J.1998) (GEB) for the proposition that when a certification is not submitted with plaintiffs' opposition papers, but only submitted after the issue was raised by defendants, it is untimely. *Id.* at 350 n. 2. In that case, the Court explained:

> In their reply brief, plaintiffs noted that defendants did not submit an affidavit pursuant to Fed.R.Civ.P. 56(f) explaining the need for additional discovery to oppose plaintiffs' cross-motion for summary judgment. Subsequent to the filing of plaintiffs' reply brief, defendants filed a Rule 56(f) certification attesting that additional discovery was required on these issues. This certification, in effect, constitutes a sur-reply, which is not provided for in this Court's Local Civil Rules, nor did defendants' request permission from the Court to file a sur-reply. Moreover, defendants' Rule 56(f) certification has not been timely submitted as it was not filed with defendants' opposition papers, but was only submitted after the issue was raised by plaintiffs. *See, e.g., Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 92 (1st Cir.1996). Furthermore, even if considered timely, the certification submitted fails to comply with Rule 56(f)'s requirements. *The Third Circuit has interpreted Rule 56(f) "as imposing a requirement that a party seeking further discovery in response to a summary judgment motion submit an affidavit specifying, for*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1379712 (D.N.J.)
**(Cite as: 2010 WL 1379712 (D.N.J.))**

*example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." See Dowling v. City of Philadelphia,* 855 F.2d 136, 139-40 (3d Cir.1988). *Here, while defendants have listed the discovery they request, defendants have failed to indicate how if uncovered it would preclude summary judgment and why it was not previously obtained.*

*4 *Id.* (emphasis added). There, as here, the motion for continuance was not filed until after the issue was addressed by the non-moving party and there, as here, the motion for continuance did not specifically state why the specific information would preclude summary judgment and why it has not been previously obtained, which is required by now 20 year old Third Circuit case law. The Court concludes that the 56(f) motion is procedurally deficient, and will deny the plaintiff's request.

**2. Summary Judgment Motion**

Defendants' summary judgment motion argues that: (1) plaintiff's complaint is barred by the doctrine of *res judicata;* (2) plaintiff's complaint is barred by the statute of limitations, and (3) plaintiff fails to state the necessary elements of his various other causes of action. (Def.'s Br.; Doc. No. 6.)

**a. *Res Judicata***

Res Judicata refers to the common law doctrine barring re-litigation of claims or issues that have already been adjudicated. *Velasquez v. Franz,* 123 N.J. 498, 505, 589 A.2d 143 (1991). According to the doctrine of res *judicata,* a cause of action between two parties that has been finally determined on the merits by a tribunal having jurisdiction cannot be re-litigated by those parties or their privies in a new proceeding. *Roberts v. Goldner,* 79 N.J. 82, 85, 397 A.2d 1090 (1979). The three basic elements that lead to a claim being barred by *res judicata* are: (1) the judgment in the prior action must be valid, final, and on the merits; (2) the parties in

the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must arise out of the same transaction or occurrence as the claim in the earlier one. *Murray v. Crystex Composites LLC,* 618 F.Supp.2d 352, 357 (D.N.J.2009); *Federated Dep't Stores v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981).

Here, there was a prior civil action in state court on April 19, 2004. That state court case was dismissed with prejudice upon motion by Ocean County and is considered an adjudication on the merits. *Velasquez,* 123 N.J. at 506-507, 589 A.2d 143. Second, the parties in this action are nearly identical to those on the state court action, both naming Ocean County and John Doe defendants.[FN1] Third, with the exception of a malicious prosecution counts, the current federal complaint seeks relief for the same underlying events-incidents that occurred at the Schneider home and farm on April 22, 2003-as the state court complaint.

> FN1. The Court recognizes that the current action has also added an additional defendant, Sandra Rodriguez. For the reasons stated *infra,* the portion of the complaint related to this defendant is not barred by *res judicata.*

The Court concludes that Counts II-VII and Count IX are barred by the doctrine of *res judicata* as they arise out of the April 22, 2003 incident and were already adjudicated on the merits by a state court tribunal.

**b. *Statute of Limitations***

In a similar vein to the *res judicata* problems that pervade the complaint, there are also statute of limitations issues. The applicable statute of limitations in civil rights actions filed under 42 U.S.C. §§ 1983 and 1985 is determined by the state's statute of limitations for personal injury actions, regardless of the topical nature of the civil rights claim that was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1379712 (D.N.J.)
**(Cite as: 2010 WL 1379712 (D.N.J.))**

pled. *Owens v. Okure*, 488 U.S. 235, 241, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). In New Jersey, there is a two-year statute of limitations for personal injury claims. N.J.S.A. § 2A:14-2. Claims arising under the New Jersey State Constitution are also controlled by a two-year statute of limitations. *Freeman v. State of New Jersey*, 347 N.J.Super. 11, 22, 788 A.2d 867 (App.Div.2002).

*5 Here, the limitations period for plaintiff's § 1983 action began to run when he was aware of the source of his injury. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386 (3d Cir.1994). Plaintiff claims that the alleged malicious prosecution, which did not accrue until later, somehow resurrects the other counts of his complaint. However, this ignores the fact that Plaintiff knew of the source of his injury on April 22, 2003, (the date of the alleged "farm raid") and was even aware that his injuries may be legal wrongs upon the filing of a notice of tort claims in July, 2003. The Court concludes that plaintiff's complaint, in Counts II-VII and Count IX, contains allegations that are time-barred. The same claims for malicious prosecution that survived the *res judicata* analysis similarly survive the statute of limitations analysis.

### c. *Remaining Claims*

The two remaining claims are for malicious prosecution, alleging via state law and § 1983 that plaintiff was forced to defend himself in a five-year long criminal matter that ended in the dismissal of the indictment. (Compl. ¶ 86-87; Doc. No. 2.) Defendants argue that there is no foundation on which to state a claim against the County of Ocean or the Prosecutor's Office because they are agents of the State of New Jersey, not of Ocean County. Plaintiff's attorney conceded at oral arguments that, as a matter of law, the Ocean County Prosecutor is a constitutional officer that is an agent of the state. Further, the State Supreme Court has held that the county cannot be held liable for the actions of the County Prosecutor and its detectives when their alleged tortious conduct arose out of investigation of

criminal activity. *Wright v. State of New Jersey*, 169 N.J. 422, 438-39, 778 A.2d 443 (2001); *see also Michaels v. State*, 968 F.Supp. 230, 236 (D.N.J.1997), *aff'd* 150 F.3d 257 (3d Cir.1998) ( "[s]o long as the prosecutorial defendants in the case were 'investigat [ing] ... criminal activity' ... the County cannot be held vicariously liable.") Plaintiff fails to distinguish *Wright* in any meaningful way. At oral argument, he asserted that *Wright* only applies during so-called "ministerial" acts by prosecutorial defendants, and does not apply to the factual situation here. This is plainly incorrect. *Wright* applies to the "investigation, arrest, and prosecution" of an individual. *Id.* at 448, 778 A.2d 443

In light of the case law that lies directly on point, and plaintiff's concession that as a matter of law the Prosecutor's Office is an agent of the state, summary judgment must be entered in favor of defendant on all counts against the County of Ocean and the Ocean County Prosecutor's Office.

### III. CONCLUSION

For the foregoing reasons, the plaintiff's motion for continuance (Doc. No. 13) will be denied. Defendants' motion for summary judgment (Doc. No. 6) is granted. An appropriate form of order is filed herewith.

D.N.J.,2010.
Schneider v. Township of Toms River
Slip Copy, 2010 WL 1379712 (D.N.J.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT B

## LIST OF KEY ADMITTED FACTS

| Paragraph No. in SOF | Admitted Facts |
|---|---|
| 12 | Mutual distributed more that 100,000,000 0.6 mg. colchicine tablets without FDA approval from 1993 until July 2006 in direct competition with West-Ward. |
| 13 | Mutual utilized the same Price Lists and Wholesaler Ordering Systems that it accuses West-Ward of using in the Complaint to market its unapproved colchicine tablets. |
| 14 | The Wholesaler Ordering Systems and Price Lists reported the same categories of information for Mutual's unapproved colchicine tablets that appear for West-Ward's tablets (*i.e.* product name, strength, package size, label and its unapproved package insert, NDC number, pricing and manufacturer). |
| 16 | Between 1993 and 2006, Mutual distributed the same colchicine tablets that Defendants West-Ward and Excellium distributed, purchasing more than 170,000,000 colchicine tablets directly from West-Ward and Excellium for distribution under Mutual's own label, and using the same prescribing information, with the same safety and warning information provided with West-Ward's and Excellium's unapproved colchicine product. |
| 18 | In its Complaint, Mutual alleges that "relevant consumers are likely to mistakenly believe that the 'NR' or 'N/A' rating means that their unapproved colchicine products do not need to be approved by the FDA in order to be sold lawfully." |
| 19 | Just a few years prior to filing suit, Mutual provided the same "NR" rating for its unapproved colchicine products to McKesson, one of the country's largest wholesalers. |
| 20 | Mutual also stated on its own website that its unapproved colchicine tablets had an "NR" rating as recently as November 2006. |

| 22 | Mutual's unapproved colchicine tablets appeared on McKesson Corporation's Wholesaler Ordering System and Red Book's Price List until at least 2009. |
|----|----|
| 23 | As of July 7, 2010, Mutual's unapproved colchine tablets still appeared on the Medi-Span Price List, which still contained essentially the same information as reported for West-Ward's tablets, including the "NR" Therapeutic Equivalency Rating. |
| 30 | Immediately after submitting their NDA to the FDA—and prior to obtaining the FDA's approval—Plaintiffs began lobbying the FDA to take immediate action against distributors of unapproved colchicine tablets, including West-Ward. |
| 34 | Plaintiffs obtained FDA approval for their colchicine tablets, called Colcrys, on or about July 29, 2009 and immediately began distributing their product at a price of $4.85 per tablet. The price for Colcrys was an approximately **5000%** increase in price from the $.09 colchicine tablets that Mutual sold only a few years earlier. |
| 42 | In the months following the FDA's approval of Colcrys, Plaintiffs pressed the FDA to take immediate enforcement action against unapproved colchicine tablets. |
| 43 | Rather than wait for the FDA to take action against the distributors of unapproved colchicine, Plaintiffs initiated this lawsuit as their backup "legal strategy," seeking relief from the United States District Court for the Central District of California, the same district court in which a preliminary injunction in the *Ivax* case was granted. |
| 44, 47-48 | Plaintiffs filed an Emergency Motion for Preliminary Injunction in the present lawsuit against Defendants on September 11, 2009, seeking to enjoin Defendants from marketing, selling, and/or distributing their colchicine tablets. The California Court that adjudicated the motion found that "the evidence indicates that almost up to the moment they commenced this action, [Plaintiffs] were engaged in precisely the same activity over which they now seek to enjoin their competitors." The California Court concluded that "the |

| | |
|---|---|
| | doctrine of unclean hands substantially decreases the likelihood that Plaintiffs will ultimately prevail on the merits." |
| 50 | In the days, weeks, and months after Plaintiffs' Motion for Preliminary Injunction was denied, Plaintiffs sent another round of letters to the FDA, again urging the agency to take immediate enforcement action against unapproved colchicine tablets. |